**James E. O'NEIL, In his Capacity as Attorney General of the State of Rhode Island**

v.

**Warren V. PICILLO, Sr., et al.**

Civ. A. No. 83–0787 P.

United States District Court, D. Rhode Island.

March 8, 1988.

Gary Powers, Asst. Atty. Gen., Providence, R.I., for plaintiff.

Warren Picillo, Jr., pro se.

James H. Russell, Baker & Hostetler, Orlando, Fla., John Cuzzone, Jr., Richard Boren, Howard Lipsey, Providence, R.I., for Morton–Thiokol Corp.

Christopher Little, Providence, R.I., for Nat'l Starch Corp.

Leif Sigmond, pro se.

S. Paul Ryan, Providence, R.I., William G. Ballaine, Siff & Newman, New York City, C. Russell Bengtson, Richard T. Linn, Providence, R.I., for United Sanitation, Inc., Daniel Capuano, A. Capuano Bros., Inc., Jack Capuano, Sanitary Landfill, Inc., and Anthony Capuano.

A. Lauriston Parks, James T. Murphy, Providence, R.I., for Advanced Environmental Technology Corp.

Barbara S. Cohen, Anthony Muri, Providence, R.I., for Monsanto Co.

Gregory L. Benik, Providence, R.I., for Olin Corp.

Dominick Presto, Presto & Barbire, Rutherford, N.J., for Scientific Control Processing & Scientific Environmental Control Systems.

John F. Bomster, David J. Oliveira, Providence, R.I., for Hydron Lab.

Deming S. Sherman, Providence, R.I., for Exxon Research & Engineering Co., Rohm & Haas Co., American Cyanamid Co.

Alden C. Harrington, Providence, R.I., for Warren Picillo, Jr.

Harold E. Krause, Providence, R.I., for Michael Musillo.

Harold Hestnes, Hale & Dorr, Boston, Mass., Benjamin B. White, III, Providence, R.I., for GAF.

John F. Dolan, Rice Dolan & Kershaw, Dean Temkin, Willey & Leroy, Providence, R.I., Richard Ricci, Roseland, N.J., for Rutgers University.

John Baglini, Providence, R.I., for M & T Chemicals.

Richard Galli, Providence, R.I., for Hydron Laboratories, Inc.

Robert Canty, Csaplar & Bok, Boston, Mass., for Hercules Inc.

Charles D. Wick, Providence, R.I., for Mack Barnes.

OPINION

PETTINE, Senior District Judge.

The State of Rhode Island ("State") seeks to hold the defendants jointly and severally liable for one million six hundred and thirteen thousand four hundred and

thirty-seven dollars and thirty cents ($1,613,437.30) it expended in cleaning up a hazardous waste site in Coventry, Rhode Island known as the Picillo Pig Farm; it also asks this Court to declare that the defendants must respond in damages for all remedial costs it may incur in the future in the investigation and remediation of damages to the State's natural resources allegedly resulting from the waste disposal by these defendants at said site.

The action is brought pursuant to the Comprehensive Environmental Response Compensation and Liability Act of 1980 ("CERCLA") as amended by the Superfund Amendments and Reauthorization Act of 1986 ("SARA") 42 U.S.C. sections 9601–9675.

The complaint originally named thirty-five defendants who were either owner/operators of the site, parties who allegedly transported waste there, parties alleged to have arranged for their waste to be transported to the site, and parties alleged to have produced waste deposited at the site. However, on the day designated for trial, the State and the United States Environmental Protection Agency ("EPA"), a non-party, settled with all the defendants except Olin Corporation ("Olin"), Hydron Laboratories, Inc. ("Hydron"), American Cyanamid Company ("American Cyanamid"), Exxon Research and Engineering Company ("Exxon"), and Rohm & Haas Company ("Rohm & Haas"). The settlements totaled 5.8 million dollars and included various agreements to perform specific remedial action. The State has represented that it will receive 25 percent of the settlement with the remaining 75 percent going to the federal agency.

These remaining defendants claim that the State has failed to prove that the materials in question were hazardous; they also argue that joint and several liability which the State seeks to impose is not appropriate in this case, and that they have the right to interpose several defenses, equitable and legal, which preclude recovery against them.

For the reasons which follow, I find for the plaintiff.

Prolixity is not a commendable hallmark of a legal opinion; the extent of the footnotes here indicate this paper deserves just such an unenviable stamp. In the margin I have substantially quoted from prior opinions rendered in this case; I do so because they set forth the dispositive law of vital legal issues and so I incorporate the same as part of this ruling. Colloquy took place throughout the trial as though certain of these issues had not been rendered; none of it was meaningful enough to cause me to change my position.

## I. FACTUAL BACKGROUND

As an overall, with greater specificity being recited at appropriate points in the discussion of the legal issues, I repeat what I stated in my Opinion and Order of November 20, 1986, *Violet v. Picillo*, 648 F.Supp. 1283 (D.R.I.1986) ruling on Olin's Motion for Summary Judgment:

> This case arises from the chemical catastrophe of the Picillo pig farm in Coventry, Rhode Island. State environmental authorities discovered this chemical wasteland in 1977 after combustible chemicals caused a dramatic explosion and towering flames to rip through the waste disposal site. After the fire, state investigators discovered large trenches and pits filled with free-flowing, multicolored, pungent liquid wastes; they also excavated approximately 10,000 barrels and containers in varying states of decay containing hazardous chemical wastes.

*Id.* at 1286.

In this case, the plaintiff claims the following materials found at the site were specifically traced to the defendants: 303 five-gallon cans and 49 fifty-five gallon drums to Rohm & Haas; 21 fifty-five gallon drums to Hydron; 15 fifty-five gallon drums to Exxon; 3 fifty-five gallon lab packs and 11 fifty-five gallon drums to Olin; and 10 fifty-five gallon drums to American Cyanamid.

## II. JURISDICTION

In the pre-trial stages of this action, defendants Exxon and Hydron filed motions for dismissal pursuant to Fed.R.Civ.P.

12(b)(2) for lack of *in personam* jurisdiction. Each disavowed any knowledge of how waste allegedly generated by them came to rest at the Picillo site, and each claimed to lack any significant links to the state of Rhode Island independent of the present litigation. In *Violet v. Picillo,* 613 F.Supp. 1563 (1985), I set forth a lengthy and detailed discussion of the jurisdictional aspects of this case and I repeat the same here in the margin.[1] I concluded by saying:

1. Rule 4(f) of the Federal Rules of Civil Procedure provides in pertinent part that:

> All process other than a subpoena may be served anywhere within the territorial limits of the state in which the district court is held, and, when authorized by a statute of the United States or by these rules, beyond the territorial limits of that state.

Under the framework created by the Rules, the jurisdictional reach of a federal district court is coextensive with that of the courts of the state in which it sits, unless a specific federal statute, or separate rule, permits nationwide service of process. *See generally Johnson Creative Arts v. Wool Masters,* 743 F.2d 947, 950 (1st Cir.1984); 4 Wright & Miller, *Federal Practice and Procedure* section 1125 (1969 & 1984 supp.).—No separate Rule applies here. The inquiry, thus, is whether CERCLA is such an authorizing statute.

The state offers two theories in support of its claim that CERCLA authorizes federal process to run throughout the nation. It argues first that CERCLA's express terms supply the required authority, and alternatively that implying such a provision is necessary to effectuate the statutory purposes.

Turning first to the state's textual argument, I find that CERCLA is altogether silent as to personal jurisdiction and service of process, and find that the language of the statute will not bear plaintiff's contrary interpretation. Section 9613(b), subtitled "Jurisdiction; venue," provides:

> Except as provided in subsection (a) of this section, the United States district courts shall have exclusive original jurisdiction over all controversies arising under this chapter, without regard to the citizenship of the parties or the amount in controversy. Venue shall lie in any district in which the release or damages occurred, or in which the defendant resides, may be found, or has his principal office. For the purposes of this section, the Fund shall reside in the District of Columbia.

42 U.S.C. section 9613(b). In urging that this section authorizes national service of process, the state appears to confuse subject matter jurisdiction with personal jurisdiction. The language conferring exclusive original jurisdiction in the federal district courts "without regard to the citizenship of the parties or the amount in controversy"—language seized upon by the state —is relevant to *subject matter jurisdiction* in actions brought under the statute. Consistent with the language of Article III of the Constitution, and established canons of federal jurisdiction, the effect of this sentence is simply to place actions brought under CERCLA within the federal courts' federal question, and not diversity, jurisdiction. It strikes the Court as too clear to require further articulation that this language does not purport to govern questions of personal jurisdiction.

And, while the presence of language in section 9613 regarding venue demonstrates that Congress saw fit to fashion special venue rules for CERCLA actions, the absence of any parallel language regarding nationwide service of process suggests to the Court that Congress provided no special rule for personal jurisdiction. This is especially apparent in the face of the fact that the numerous other federal statutes authorizing nationwide service of process typically contain clear and express language extending the jurisdictional reach of the federal courts. *See, e.g.,* 15 U.S.C. section 5 (actions by United States under Sherman Antitrust Act); 15 U.S.C. section 25 (actions by United States under Clayton Act); 15 U.S.C. section 77v(a) (actions under Securities Act of 1933); 15 U.S.C. section 78a (actions under Securities Exchange Act of 1934); 28 U.S.C. sections 1335, 1397, 2361 (actions under federal interpleader act).

It is true that express statutory language is not an absolute *sine qua non* for finding nationwide service of process, for courts have occasionally implied such authority in the absence of clear language. *See, e.g., United States v. Congress Construction Co.,* 222 U.S. 199, 32 S.Ct. 44, 56 L.Ed. 163 (1911); *F.T.C. v. Browning,* 435 F.2d 96 (D.C.Cir.1970). In these cases, however, and others that followed their teachings, the federal statutes involved laid venue in only one district, such that a failure to imply authority for extraterritorial process would deprive *any* federal court of the power to adjudicate cases under the statute, absent the fortuitous circumstance that a defendant enjoyed the necessary minimum contacts with the sole district in which venue was proper. No similar problem is posed here, for CERCLA lays venue "in any district in which the release or damages occurred, or in which the defendant resides, may be found, or has his principal office," 42 U.S.C. section 9613(b). The state has not cited, and the Court has not discovered, any case in which nationwide service of process was implied where venue was not laid exclusively in one district. Nor has the state cited, or the Court discovered, any direct reference in the Act's legislative history to personal jurisdiction in CERCLA actions, or to congressional contemplation of a special rule of national jurisdiction.

Nonetheless, plaintiff's belief that a nationwide service of process provision must be implied in CERCLA to further the statute's aims is not without strong appeal. Without analyzing the statutory scheme with any precision, it is

clear that CERCLA's principal purpose is "to initiate and establish a comprehensive response and financing mechanism to abate and control the vast problems associated with abandoned and inactive hazardous waste sites." H.R.Rep. No. 96–1016, Part I, 96th Cong., 2d Sess., at 22 (*reprinted in* 1980 U.S.Code Cong. & Ad.News 6119, 6125, (hereinafter "1980 U.S.C.C. & A.N."). In service of its goal, Congress created, by last minute compromise in the waning hours of the 96th Congress, a "Superfund," to be jointly financed by industry and the federal government, to provide a ready source of financing for prompt clean-up of waste sites, 42 U.S.C. sections 9631, 9632, 9641; *see* 1980 U.S.C.C. & A.N., *supra,* at 6134–6135. Congress also created, *inter alia,* a federal cause of action in strict liability, through which owner-operators of hazardous waste sites, as well as disposal and transport arrangers, and generators of waste, 42 U.S.C. section 9607(a)(1)–(4), are made liable, subject only to limited statutory defenses, *id.* at section 9607(b)(1)–(4), for removal, remedial and response costs, *id.* at section 9607(a)(4)(A)–(B), and for certain specified environmental damages, *id.* at section 9607(a)(4)(C), when "there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, " *id.* at section 9607(a)(4).

Placing CERCLA in the context of its purposes, it is anomalous, indeed, to conclude that Congress meant to allow CERCLA defendants to interpose personal jurisdiction defenses. This is so for at least three reasons.

First, allowing CERCLA defendants to invoke the traditional minimum contacts doctrine, which looks largely to the extent to which a nonresident has chosen to affiliate itself with a particular forum, *see, e.g., Worldwide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980), or at least with the stream of interstate commerce, *id,* at 297–98, 100 S.Ct. at 567, is at odds with the substantive liability provisions of the Act. Under the latter provisions, liability may generally attach to a defendant who has itself taken no deliberate action with respect to a particular site, but whose activities contributed to the release of hazardous substances at that site. The purpose of this "very stringent standard of liability," *U.S. v. Price,* 577 F.Supp. 1103, 1114 (D.N.J.1983), is to further Congress' stated goals of "cost-spreading and assurance that responsible parties bear the cost of their clean up," *id.* at 1114; *see* 1980 U.S.C.C. & A.N. at 6119–6120; 126 Cong.Rec. S15,003 (daily ed. Nov. 24, 1980) (remarks of Sen. Chafee).

Bringing waste generators within the ambit of the Act's liability provisions was, as a practical matter, an especially important part of CERCLA's objective of appropriate cost allocation. The legislative history of CERCLA indicates that the Environmental Protection Agency estimated in 1980 that perhaps only ten percent of the 77.1 billion pounds of waste annually generated are disposed of in an environmentally sound manner. 1980 U.S.C.C. & A.N. at 6124. Calling waste generators to account for the consequences flowing from the disposal of their toxic waste products, generally without regard to whether they were themselves directly at fault in disposing of their wastes, represents a congressional decision to look for compensation to those economic actors who have participated in, and benefited from, an industry historically pervaded by irresponsible practices at various levels in the chain of disposal. *See, e.g.,* 1980 U.S.C.C. & A.N. at 6120 (discussing "massive problem" of "tragic consequences of improperly, negligently, and recklessly [sic] hazardous waste disposal practices"); *id.* at 6121 (Congressional finding that "[u]nsafe design and disposal methods are widespread"); *id.* at 6128 (Congressional finding that "improper hazardous waste disposal has occurred throughout the country [and] the locations of many hazardous waste sites are unknown"); 126 Cong.Rec. S14,963 (daily ed. of Nov. 24, 1980) (remarks of Sen. Randolph) (discussing history of disposal practices and fact that numerous generators used haulers "to take wastes to unknown locations").

Significant among the pervasive industrial practices recognized by Congress is the problem of dumping wastes at improper, illegal or inappropriate sites, and the associated problem of "midnight," or clandestine dumping of chemical wastes at abandoned, remote or hidden locations. *See, e.g.,* 1980 U.S.C.C. & A.N. at 6121–22 (describing various practices at selected sites); 126 Cong.Rec. S14,973 (daily ed. Nov. 24, 1980) (remarks of Sen. Tsongas) (describing practices of "'midnight dumpers' who dispose of toxic chemicals and hazardous materials in quarries, in streams, in forests, or spread them on open roads ..."); *id.* at 14,973 (remarks of Sen. Ford). And, legislators recognized that the problem of "midnight dumping" frequently involves waste that is transported over state lines. *See, e.g.,* 126 Cong.Rec. H9,461 (daily ed. Sept. 23, 1980) (remarks of Rep. Martin) ("because of the nature of clandestine dumping operations [a] State ... which does not generate a large volume of toxic waste, has been victimized as a dumping ground for waste from other States"); 126 Cong.Rec. H11,798 (remarks of Rep. Edgar) (daily ed. Dec. 3, 1980) ("'midnight dumpers' [have] trucked wastes from all over the Eastern Seaboard and dumped them illegally at various sites through [Pennsylvania]"); 126 Cong.Rec. H9,448 (remarks of Rep. LaFalce) (daily ed. Sept. 23, 1980) (noting interstate scope of problem). This unfortunate history attests to the existence of a vast, unmonitored secondary toxic disposal market—one which, according to CERCLA's legislative history, weaves across state lines and reaches to every corner of this nation.

In the face of such a history, it is surely reasonable to assume that CERCLA actions may often involve generator defendants who arrange with an intermediary for waste disposal, and who lack direct knowledge as to how their waste may have to come to arrive in a foreign state—and lack, as well, independent contacts with that state. It thus strikes the Court as

incongruous to permit defendants to seek dismissal upon a showing that they did not *deliberately* affiliate themselves with a particular forum state. And while defendants in this case rightly point out that amenability to suit in a particular forum should not be confused with liability under the Act, the factors I discuss below suggest that there is an especially peculiar inconsistency between jurisdictional and liability rules in the case at hand.

Second, if the party suing to recover response costs and damages for cleaning up a single site is forced to bring several actions, in several states, in order to reach all those whose products may have been dumped at that site (but who may have few or no other contacts with the state), the increased litigation costs will obviously diminish that party's ultimate recovery and undermine the compensatory purposes of the statute. This is especially so where, as here, a state government, and not the EPA, is the party plaintiff, for states obviously lack the national litigation capacity of the federal government. Indeed, state governments faced with the prospect of maintaining multiple actions in multiple states may well forego suit against foreign defendants who cannot be haled into the forum. Reducing or eliminating the recovery available to states under CERCLA would be especially unfortunate because, as Congress recognized, it is state and local governments who have been historically saddled with the costs of cleaning up abandoned sites where no solvent owner can be found. *See* 1980 U.S.C.C. & A.N., at 6123. And, even where the federal government is suing, the increased costs of multiple lawsuits will necessarily diminish the amount of its recovery, and will consequently diminish the sum available to replenish the Superfund. *See* 1980 U.S.C.C. & A.N. at 6136 ("[t]he purpose of [the Act's liability provisions] is to provide a mechanism for prompt recovery of monies expended for the costs of such action from the [Superfund] from persons responsible therefor . . ."); Note, *Generator Liability Under Superfund for Clean-Up of Abandoned Hazardous Waste Dumpsites, supra,* at 1232 (discussing importance, in statutory scheme, of replenishing the Superfund).

Third, in CERCLA actions in which multiple defendants are involved, there will invariably be—as there are in this case—numerous cross-claims among the defendants, and litigation as to the proper scope of joint and several liability, *see State of New York v. Shore Realty,* 759 F.2d 1032, 1042 and n. 1 (2nd Cir.1985) (discussing judicial role in formulating rules governing joint and several liability under the Act); contribution, indemnification, *see* 42 U.S.C. section 9607(e); and the like. If some defendants are not subject to the jurisdiction of the court in which the main action is brought, however, and fractionated proceedings in other states ensue, the proper resolution of these issues will inevitably be complicated and impeded.

As these observations suggest, I am of the view that a rule of nationwide service of process under CERCLA has much to commend it, and would be the rule most consistent with Congress' objectives. I am also mindful, however, that the decision whether to allow extraterritorial process is for the Congress, and not the courts, to make. For this is not simply a case of statutory construction where it falls to a court to interpret statutory ambiguity, or silence, in the manner suggested by the statute's legislative history and its purpose. Rather, by virtue of the approach prescribed by the Federal Rules of Civil Procedure regarding personal jurisdiction in federal question cases, this is an instance where congressional silence is assigned a presumptive meaning—namely, that the federal district courts will observe the territorial limits of the respective states in which they sit. Absent any compelling reason to inquire further, as was present in the cases involving statutes that laid venue in only one district, I am constrained to find that Congress has not authorized nationwide service of process in CERCLA actions. In reaching this result, I am in accord with the Magistrate's decision, and with the only other federal decision of which I am aware on this question. *See Wehner v. Syntex Agribusiness,* No. 83–642 (E.D.Mo. April 1, 1985), at 2 (concluding without discussion that CERCLA "does not authorize nationwide service of process").

## B. Minimum Contacts

The absence of a rule authorizing national jurisdiction does not, of course, end the inquiry. I must next decide whether, under governing standards of personal jurisdiction, the four defendants before me are subject to the jurisdiction of a Rhode Island court.

.  .  .  .  .

Whether this Court has jurisdiction over the . . . defendants depends upon whether it would comport with the "traditional notions of fair play and substantial justice," *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) (citations omitted), rooted in the due process clause of the Fourteenth Amendment, to compel these parties to defend this litigation here. Because Rhode Island has extended its longarm statute to the extent permitted by the federal Constitution, R.I.G.L. section 9–5–33; *see Roger Williams General Hospital v. Fall River Trust Co.,* 423 A.2d 1384 (R.I.1981), there are no separate state statutory requirements for the exercise of jurisdiction. The fundamental question here is, thus, whether "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980). In judging whether sufficient minimum contacts exist to make an exercise of jurisdiction reasonable, "a court properly focuses on 'the relationship among the defendant, the forum and the litigation.'" *Calder v. Jones,* 465 U.S. 783, 104 S.Ct. 1482, 1486, 79 L.Ed.2d 804 (1985) (quoting *Shaffer v. Heitner,* 433 U.S. 186, 204, 97 S.Ct. 2569, 2579, 53 L.Ed. 2d 683 (1977)). By way of guidance to courts charged with the task of evaluating this critical

relationship, the Supreme Court has further explained that:

Implicit in this emphasis on reasonableness is the understanding that the burden on the defendant, while always a primary concern, will in an appropriate case be considered in light of other relevant factors, including the forum State's interest in adjudicating the dispute, see *McGee v. International Life Ins. Co.,* 355 U.S. 220, 223, 78 S.Ct. 199, 201, 2 L.Ed.2d 223 (1957); the plaintiff's interest in obtaining convenient and effective relief, see *Kulko v. California Superior Court, supra,* 436 U.S. [84] at 92, 98 S.Ct. [1690] at 1697 [56 L.Ed.2d 132 (1978) ] at least when that interest is not adequately protected by the plaintiff's power to choose the forum, cf. *Shaffer v. Heitner,* 433 U.S. 186, 211, n. 37, 97 S.Ct. 2569, 2583, n. 37, 53 L.Ed.2d 683 (1977); the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several States in furthering fundamental substantive social policies, see *Kulko v. California Superior Court, supra,* 436 U.S., at 93, 98, 98 S.Ct., at 1697, 1700. *World–Wide Volkswagen v. Woodson, supra,* 444 U.S. at 292, 100 S.Ct. at 564.

Determining whether, upon application of these general principles, it is "fair" and "reasonable" to subject defendants ... to the jurisdiction of this Court, raises novel and difficult questions. Although a body of law has developed to guide courts in deciding jurisdictional questions where a nonresident manufacturer, distributor or merchant of a product is sued for injuries caused by the product in the forum state, *see generally World–Wide Volkswagen, supra;* 4 Wright & Miller, *Federal Practice and Procedure,* section 1067, at 38–44 (1984 Supp.), I have discovered few cases applying these principles to nonresident generators, transporters or handlers of hazardous waste products, who are called to answer in the forum state for damage caused by the disposal of their wastes there. Believing that the precedents dealing with product manufacture and sales nonetheless offer the closest analogy, I look primarily to those cases for guidance.

In *World–Wide Volkswagen* the Court held that Oklahoma could not predicate jurisdiction over a New York automobile dealer and a New York automobile distributor (whose market was confined to New York, New Jersey and Connecticut), upon the fact that a car sold by these parties in New York was driven to Oklahoma and was involved in an accident there. Given the fact that these defendants had a "total absence of affiliating circumstances" with Oklahoma, 444 U.S. at 294, 100 S.Ct. at 565, and had in no way sought, themselves or "indirectly, through others," *id.,* to serve the Oklahoma market, the Court held that it would violate due process to base jurisdiction on such a single fortuitous circumstance. If merchants serving only a limited market were subject to suit wherever a product sold by them happened to be taken and cause injury, "[e]very seller of chattels would in effect appoint the chattel his agent for service of process. His amenability to suit would travel with the chattel," *id.* at 296, 100 S.Ct. at 566.

The Court in the *World–Wide Volkswagen* case was not directly confronted with the question whether jurisdiction in the action was proper over the international and national distributors of the car involved in the accident, for those parties, while defendants in that case, did not contest their amenability to suit. In dictum, however, the Court contrasted the situation of such distributors with that of local seller, and made clear that jurisdiction could be asserted over these distributors, explaining:

if the sale of a product of a manufacturer or distributor such as Audi or Volkswagen is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others. The forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State. *Cf. Gray v. American Radiator & Standard Sanitary Corp.,* 22 Ill.2d 432, 176 N.E.2d 761 (1961).

*Id.* at 297–298, 100 S.Ct. at 567. As subsequent courts developing this pivotal distinction have explained, the key factors justifying a different jurisdictional rule are twofold.

First, unlike local merchants, such interstate distributors have an "interest in reaching as broad a market as" possible, *Bean Dredging Corp. v. Dredge Technology Corp.,* 744 F.2d 1081, 1085 (5th Cir.1984) and place their products into the stream of commerce with either the subjective intention, *see, e.g., Stabilisierungsfonds Fur Wein v. Kaiser,* 647 F.2d 200, 203 (D.C.Cir.1981), or objective reason to know, *see, e.g., Oswalt v. Scripto,* 616 F.2d 191, 200–201 (5th Cir.1980) that their products will be sold "to a nation-wide market, that is, in any or all states," *id.* at 200. Thus, even if their "products were sold indirectly through importers or distributors with independent sales and marketing schemes," *DeJames v. Magnificence Carriers, Inc.,* 654 F.2d 280, 285 (3d Cir.), *cert. den.* 454 U.S. 1085, 102 S.Ct. 642, 70 L.Ed.2d 620 (1981), (citations omitted)—independent parties whom the defendant distributors do not directly control, *Nelson by Carson v. Park Industries,* 717 F.2d 1120, 1126 (7th Cir.1983), *cert. den.* 465 U.S. 1024, 104 S.Ct. 1278, 79 L.Ed.2d 682 (1984) —and even if their products are sold to an intermediary with " 'no indication whatsoever as to their ultimate destination,' " *Bean Dredging Corp. v. Dredge Technology Corp., supra,* 744 F.2d at 1085 (quoting party's brief), the fact that these manufacturers or distributors place their products in a stream of commerce destined for sale through a broad interstate market, and reap

the attendant benefits, renders them properly subject to suit in one of the states comprising that market.

The second important distinguishing factor is that, unlike local merchants serving a self-circumscribed market, who "ordinarily [have] no control over where the buyer takes the product after it is sold," *Comm. of Puerto Rico v. S.S. Zoe Colcotroni,* 628 F.2d 652, 669 (1st Cir.1980), *cert. den.* 450 U.S. 912, 101 S.Ct. 1350, 67 L.Ed. 2d 336 (1981), parties operating on a broad interstate scale can act "to limit the states in which [their products will] be sold," *Bean Dredging Corp., supra,* 744 F.2d at 1085, and can thereby protect themselves against suit in an undesired forum. *See World–Wide Volkswagen v. Woodson, supra,* 444 U.S. at 297, 100 S.Ct. at 567 (potential defendants can "structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit"); *Oswalt v. Scripto, supra,* 616 F.2d at 200 (distributor could have limited the states in which its products would be sold); *Rockwell International Corp. v. Costruzioni Aeronautiche,* 553 F.Supp. 328, 333 (E.D.Pa. 1982) (manufacturer could have limited the states in which its products would be sold).

Applying these teachings to the case before me, I find that jurisdiction is proper over ... Hydron. Although those defendants attempt to liken themselves to the local sellers in these products liability cases, on the record before me, defendants are more properly analogized to the interstate distributors and manufacturers. I fully recognize that applying these principles to generators of hazardous wastes requires some extension of these principles beyond the context in which they were originally developed, but I believe that such an extension is warranted, indeed required, here.

The factual circumstances present here strongly indicate that ... defendant should have known, if it did not, in fact know, that it was dispatching its hazardous chemical wastes into a stream of commerce broad enough to include "*any* or *all* states," *Rockwell Intern. Corp. v. Costruzioni Aeronautiche, supra,* 553 F.Supp. at 333 (emphasis in original). In substance, what ... defendant did was to place its wastes in the hands of an intermediary—one who, according to the record, quite literally operated in more than one state—with no reasonable expectation as to where these materials were destined for disposal, and with no attempt to specify the location, or even the state, in which its wastes were to be disposed. This chosen course of conduct must be viewed in the context of a hazardous waste disposal industry recognized by Congress to be permeated, on a national scale, by problems of improper waste disposal, and in particular by problems of dumping wastes—frequently taken across state lines—at illegal, inappropriate or remote sites. When so viewed, each defendant's decision to send its toxic wastes on a virtual one-way journey to anywhere represents a decision to avail itself of the benefits of a potentially boundless national disposal market.

Certainly, benefits flowed to the defendant[] as a result of [its] chosen means of disposing of [its] wastes. [It] transferred from [itself] to a third party the burdens of properly transporting and locating hazardous waste for disposal, and of ensuring safe and environmentally sound disposal. Because disposal of wastes that are the by-products of defendants' commercial (or research) activities is a necessary predicate for continued activity, the benefits of these transferred burdens are significant. To be sure, the benefits inuring to these waste generators are not precisely like in kind to those enjoyed by the ordinary interstate distributor or manufacturer, whose profits grow as its market enlarges, and who seeks deliberately to reach as broad a market as possible. Yet, while these generator defendants may not have had a discrete commercial interest in spreading their toxic wastes through as broad a disposal network as possible, there can be no doubt, and Congress recognized as much, that the continued availability, and expansion, of a secondary, substandard disposal market has carried economic benefit for the industry as a whole.

Moreover, this is not a situation in which the product placed in the stream of commerce is an ordinary one. Rather, these defendants dispatched into that stream volatile and dangerous toxic substances—and did so without determining where these substances would come to rest. As other courts have recognized, and as common sense suggests, where a defendant deals in such inherently dangerous products, a lesser showing than is ordinarily required will support jurisdiction. *See Poyner v. Erma Werke GMBH,* 618 F.2d 1186, 1192 (6th Cir.1980); *Velandra v. Regie Nationale Des Usines Renault,* 336 F.2d 292, 298 (6th Cir.1964); *cf. Valve Engineering Co. v. Gisell,* 140 Ga.App. 44, 230 S.E.2d 29 (1976). This is especially so where, as here, the defendant(s) engage[d] in heavily regulated activities, such that it is reasonable for [it] to foresee, given their chosen course of conduct, having to litigate in a distant forum. *See generally G.R.M. v. Equine Inv. and Man. Group.,* 596 F.Supp. 307, 317 (S.D.Tex.1984).

Nor [was] defendant(s) powerless to protect [itself] from having to litigate in Rhode Island. Rather than engaging an intermediary, and giving that intermediary what appears on this record to be complete discretion in locating its wastes for disposal, [the] defendant could have handled its own waste. Alternatively, [it] could have selected, or participated in selecting, a disposal site, could have contractually required that its wastes be disposed there, and could have acted to ascertain that its waste was, in fact, finally deposited at this predetermined site. By choosing, instead, an open-ended course, the defendant(s), like the interstate distributors and manufacturers in the previously discussed cases, did not take steps, as [it] could have, so as to "be reasonably certain that [it] would not be haled into court in an undesired forum." *Comm. of Puerto Rico v. S.S. Zoe Colcotroni,*

I emphasize that only a *prima facie* showing of jurisdiction has been made here....

the final determination of the key fact issues bearing on jurisdiction over the person will be made at trial. If they are decided in a way that defeats jurisdiction as to [any] defendant, as to that defendant plaintiff's action will then be subject to dismissal for want of jurisdiction over the person.

*Id.* at 1579 n. 17 (citing *North American Video v. Leon,* 480 F.Supp. 213, 216 (D.Mass.1979)).

■ Hydron renews its motion post-trial, nourished by the testimony of David Rapaport, a director and Vice President (legal); he testified that:

Hydron was a Delaware corporation;

Its principal place of business in 1977 was New Brunswick, New Jersey;

It has never had any other principal place of business, or any other place of business;

It never had an office in Rhode Island;

To his knowledge, and based on a search of Hydron's records, the only contact with the State of Rhode Island was the delivery in 1976, by mail, of a *free* sample of one ounce of a chemical to a Rhode Island firm which had requested that the sample be sent;

Hydron did not sell or ship any other products into the State of Rhode Island;

Hydron never qualified to do business in Rhode Island;

It never nominated any agent for service of process in Rhode Island;

It placed no ads in Rhode Island.

---

*supra,* 628 F.2d at 670 (insurer with no direct business contacts in Puerto Rico is subject to jurisdiction there in suit for environmental damage caused by tanker oil spill, where it chooses to insure vessels that travel to Puerto Rico; "[b]y limiting its coverage to specified jurisdictions, [the insurer] could be reasonably certain it would not be haled into court in an undesired forum ... an insurer is not at the mercy of the insured owner's unilateral choice of destinations in the same way a seller of chattels is at the mercy of the buyer"). Without regard to whether any state or federal law required [it] to undertake such steps—a question I need not and do not consider—I find that having failed to structure [its] primary conduct to provide [itself] with minimal assurance as to where [it] would be compelled to defend hazardous waste litigation, defendant(s) may not now reasonably claim unfair surprise or undue burden in being called to answer in a state where [its] hazardous substances are alleged to have caused harm.

This conclusion is buttressed by the fact that all of the other factors enumerated by the *World–Wide Volkswagen* court as bearing on the reasonableness of jurisdiction strongly favor a Rhode Island forum.

Certainly Rhode Island's interest in adjudicating this suit could hardly be more compelling. In addition to the state's recognized "significant interest in redressing inquiries that actually occur within the State," *Keeton v. Hustler Magazine,* 465 U.S. 770, 104 S.Ct. 1473, 1479, 79 L.Ed.2d 790 (1984), Rhode Island has an extraordinarily strong sovereign interest in providing a forum for actions concerning injury to land within its borders, and for actions which seek recovery of public monies expended to protect such land. Likewise the interest of the

plaintiff state government "in obtaining convenient and effective relief," *World–Wide Volkswagen, supra,* 444 U.S. at 292, 100 S.Ct. at 564, fairly depends upon its being able to litigate this action in a single forum. In such multiparty, potentially labrynthine litigation, it will no doubt substantially burden the state to force it to proceed in parallel or piecemeal actions—and doubly so in light of the limited litigation resources available to a state government.

The interests of "the interstate judicial system ... in obtaining the most efficient resolution of" this dispute, *id.,* would plainly be served by a single adjudication of the questions raised here—all of which pertain to the same series of events at the Picillo farm. Given the matrix of cross-claims and defenses raised, and likely to be raised here, *see Infra,* at 723–724, considerations of economy and justice alike weigh heavily in favor of a Rhode Island forum. ...

Lastly, the several states of this nation surely share an important substantive interest in furthering policies designed to mitigate the widespread effects of improper management and disposal of hazardous chemical wastes. Each state's ability to utilize its own legal tools in this area, as well as those provided by the federal government, depends significantly on each state's ability to reach parties whose disposal activities have harmed its environment and its population. Because state (and local) treasuries have shouldered the greatest financial burden in cleaning up toxic waste sites where no solvent responsible party is locally available, there can be no doubt that this shared substantive interest is a powerful one.

Accordingly, for the foregoing reasons, I hold that a prima facie showing has been made that defendants ... are properly subject to the jurisdiction of this court.

In *Violet*, ruled that non-resident generators of hazardous wastes were akin to national distributors who placed their products into the stream of commerce through intermediaries. 613 F.Supp. at 1576. I held that because these generators "should have known, if [they] did not, in fact know, that it was dispatching its hazardous wastes into a stream of commerce broad enough to include any and all states" it did not offend due process to subject them to suit in one of the states comprising its "market." *Id.* at 1576–77 (citations omitted).

I am not diverted from my original holding by Hydron's proffered evidence. The analysis of jurisdiction in *Violet* was premised upon a theory of *specific* jurisdiction. *See id.* at 1575 n. 12. A court exercises specific jurisdiction when the plaintiff's claims "arise out of" or are "directly related" to defendant's contacts with the forum state. *DuPont Tire Serv. v. North Stonington Auto–Truck Pl., Inc.,* 659 F.Supp. 861, 863 (D.R.I.1987) (J. Lagueaux). General jurisdiction, however, arises where plaintiff's claims do not arise out of or are not directly related to defendant's claims. *Id.* Consequently, my only concern in *Violet* was whether the shipment of hazardous wastes into Rhode Island through intermediaries was a sufficient "contact" with the state for purposes of jurisdiction. Because Hydron's evidence relates to contacts unrelated to the cause of action, that is, contacts relevant to the concept of general jurisdiction, I see no reason to reconsider my earlier position.

I am moved, however, to reconsider my opinion in *Violet* for another reason. The holding in that case was predicated on the "stream of commerce" doctrine seemingly sanctioned in *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). There, the Supreme Court observed that "[t]he forum state does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum state." *Id.* at 297–98, 100 S.Ct. at 567.

While *Violet* was the first case to use this analysis in toxic waste cases, other courts confronted with the issue found it suitable as well. *See e.g., Allied Towing v. Great Eastern Petroleum Corp.,* 642 F.Supp. 1339, 1355–56 (E.D.Va.1986); *U.S. v. Conservation Chemical Co.,* 619 F.Supp. 162, 247–50 (W.D.Mo.1985). Since *Violet* and these other cases were decided, the Supreme Court and the First Circuit Court of Appeals handed down significant opinions concerning the continued vitality of the "stream of commerce" doctrine. While neither of these opinions were raised by the parties, they must be examined for their effect on the instant litigation.

In *Asahi Metal Ind. v. Super. Ct. of Cal., Solano Cty.,* —— U.S. ——, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987), Asahi Metal, a Japanese manufacturer of tire valves, sold its products to a Taiwanese tire manufacturer, who distributed its tires to the United States. A product liability suit was brought in California state court against the Taiwanese tire producer arising from a motorcycle accident allegedly caused by a defect in a tire. The Taiwanese company thereupon filed a cross-complaint against Asahi Metal, seeking indemnification.

Asahi argued that it was not properly before the California courts. The California Supreme court disagreed. It held that Asahi's intentional act of placing its valves into the stream of commerce by delivering them to the Taiwanese tire manufacturer, coupled with its awareness that some of them would end up in California, were sufficient contacts to support jurisdiction.

The United States Supreme Court reversed. In a divided opinion, the plurality of four justices held:

> The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed to the forum state. Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum state, for example, designing the product for the market in a forum state, establishing channels for providing regular advice to customers in the forum

state, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum state. But a defendant's awareness that the stream of commerce may or will sweep the product into the forum state does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum state.

*Id.* at 1033. Although the plurality's renunciation of a doctrine that had acquired a substantial pedigree among the lower federal courts was soundly criticized by five justices in two concurring opinions, it must be considered the last word on this aspect of minimum contacts doctrine. *See Dupont Tire Service Center, Inc., supra,* 659 F.Supp. at 863.

The First Circuit also had occasion to discuss the "stream of commerce" doctrine in *Dalmau Rodriguez v. Hughes Aircraft Co.,* 781 F.2d 9 (1st Cir.1986). In that case, Hughes Aircraft company, a Delaware corporation with offices in California, manufactured helicopters which it sold to an intermediary who had a contract to supply helicopters to the Puerto Rico police department. An alleged defect in the helicopters injured two police officers, who brought suit against Hughes. While Hughes argued lack of minimum contacts, plaintiffs argued that because Hughes knew that its helicopters were to be delivered to Puerto Rico, stream of commerce doctrine permitted jurisdiction. The first circuit, however, rejected this argument:

Assuming that Hughes knew that the destination of the helicopters was Puerto Rico, we do not think that the sale of two helicopters to a police department can be the source of a stream of commerce. This is not like opening up a particular territory for sales to the general public.... There is nothing in the record showing that Hughes advertised regularly in magazines circulated in Puerto Rico or aimed its advertising at Puerto Rico.
....
We do not think that whether Hughes knew that the helicopters were being sold to Puerto Rico police department has any jurisdictional significance. The test is not knowledge of the ultimate

destination of the product, but whether the manufacturer has purposely engaged in forum activities so it can reasonably expect to be haled into court there....

*Id.* at 15.

I believe that the extra conduct seemingly required by the *Asahi* and *Rodriguez* courts is not necessarily required in cases of the kind presented here. It has long been acknowledged, and it was unanimously reaffirmed by the Court in *Asahi,* that "the determination of the reasonableness of the exercise of jurisdiction in each case" will depend, not only on an evaluation of the defendant's connection with the forum state, but also on an evaluation of "the interests of the forum state, and the plaintiff's interest in obtaining relief." 107 S.Ct. at 1033–34 (section joined by unanimous Court). As the first circuit has stated, "[p]art of the due process equation involved in the minimum contacts standard is whether a defendant's activities relating to a particular state are such as to give that state a legitimate interest in holding a defendant answerable on a claim related to those activities." *Johnson Creative Arts, Inc. v. Wool Masters, Inc.,* 743 F.2d 947, 951 (1st Cir.1984). It is apparent from this, and it has generally been recognized, that the nature and significance of the state's interest may have a bearing on the nature and extent of the necessary contacts. *See Hanson v. Denckla,* 357 U.S. 235, 252, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958); *see also Chattanooga Corp. v. Klinger,* 528 F.Supp. 372, 378 (S.D.Tenn.1981) (in applying the minimum contacts test the requisite amount of contacts should vary according to the state's interest); Comment, *Federalism, Due Process, and Minimum Contacts: World–Wide Volkswagen Corp. v. Woodson,* 80 Colum.L.Rev. 1341, 1351–52 (1980).

As I stated in *Violet:*

Certainly Rhode Island's interest in adjudicating this suit could hardly be more compelling. In addition to the state's recognized "significant interest in redressing injuries that actually occur within the State," Rhode Island has an extraordinarily strong sovereign interest

in providing a forum for actions concerning injury to land within its borders, and for actions which seek recovery of public monies expended to protect such land. 613 F.Supp. at 1579 (citations omitted). Enhancing this interest is the fact that we are not here dealing with an ordinary product. The defendants dispatched volatile and inherently dangerous toxic substances. "Injuries caused by inherently dangerous articles imported through independent distributors certainly fall within that class of litigation with which the forum state has a deep interest in adjudicating." *Poyner v. Erma Werke GMBH*, 618 F.2d 1186, 1192 (6th Cir.), *cert. denied*, 449 U.S. 841, 101 S.Ct. 121, 66 L.Ed.2d 49 (1980); *see Klinger, supra*, 528 F.Supp. at 378 ("contacts may be minimized if the claim involves the placing of a dangerous instrumentality in commerce"); *see also Asahi Metal Ind.*, 107 S.Ct. at 1038 (Stevens, J., White, J., and Blackmun, J., concurring) ("Whether or not ... conduct rises to the level of purposeful availment requires a constitutional determination that is affected by the volume, the value, and the *hazardous* character of the components.") (emphasis added).

Additionally, the fact that the non-resident generators operate in a nationally regulated industry increases the significance of the contact with the forum. As one court has put it, "under CERCLA, a generator-defendant can reasonably anticipate being haled into court in any state in which [its] hazardous substances ... are found." *U.S. v. Conservation Chemical Co.*, 619 F.Supp. 162, 249 (D.Mo.1985); *see also Allied Towing Corp. v. Great Eastern Petroleum Corp.*, 642 F.Supp. 1339, 1356 (E.D. Va.1986) ("the scope of 'foreseeability' broadens when the enterprise giving rise to the action is subject to pervasive federal regulation"). Moreover, simply as a matter of elemental fairness, it is not unreasonable to expect a person engaged in a highly regulated activity "to suffer the consequences of being sued in a distant place." *Oxford First Corp. v. PNC Liquidating Corp.*, 372 F.Supp. 191, 202 (E.D.Pa.1974). As the Supreme Court has recognized:

[W]hen an entrepreneur embarks upon [certain types of] business activities, he has voluntarily chosen to subject himself to a full arsenal of governmental regulation....

[B]usinessmen engaged in such federally licensed and regulated enterprises accept the burdens as well as the benefits of their trade.... The businessman in a regulated industry in effect consents to the restrictions placed upon him.

*Marshall v. Barlow's, Inc.*, 436 U.S. 307, 314, 98 S.Ct. 1816, 1821, 56 L.Ed.2d 305 (1978).

Finally, as I stated in *Violet*, the interests of the plaintiff state government "in obtaining convenient and effective relief," *World–Wide Volkswagen, supra*, 444 U.S. at 292, 100 S.Ct. at 564,

fairly depends upon its ability to litigate this action in a single forum. In such multiparty, potentially labrynthine litigation, it will no doubt substantially burden the state to force it to proceed in parallel or piecemeal actions—and doubly so in light of the limited litigation resources available to the state.

613 F.Supp. at 1579.

Accordingly, I find that this court has the requisite jurisdiction.

## III.  LIABILITY

I discussed generator liability at length in *Violet*, 648 F.Supp. at 1288–90; I now incorporate that discussion as part of this ruling.[2]

---

**2.** *Generator Liability Under CERCLA Section 107*
Section 107 of CERCLA defines liability for purposes of the CERCLA statute. Under section 107, four classes of individuals may be held liable for cleanup costs associated with hazardous waste control: 1) the owner and operator of a vessel or facility; 2) owners or operators of facilities at which hazardous wastes are disposed; 3) any person who by contract, agreement, or otherwise arranged for transport to or disposal or treatment of hazardous wastes at a facility owned by another; and 4) any person who accepts or accepted any hazardous substance for transport to disposal or treatment facilities. The liability of generator defendants is covered in the third category of liable parties. The precise language of section 107(a)(3) states:

Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility owned or operated by another party or entity and containing such hazardous substances ...

(4) ... from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for—

(A) all costs of removal or remedial action incurred by the United States Government or a State not inconsistent with the national contingency plan;

(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan; and

(C) damages for injury to, destruction of, or loss resulting from such a release.

42 U.S.C. section 7607(a)(3) (1982).

The ambiguity of this provision is apparent upon close inspection. As one court has noted, the literal terms of the statute could be interpreted to impose liability on a waste generator who arranges for waste disposal by contract or agreement, but who never actually delivers the waste to a disposal facility. *See United States v. Wade*, 577 F.Supp. 1326, 1332 (E.D.Pa.1983). CERCLA is a hastily-drawn statute quickly passed through a lame-duck Congressional session. *See* Developments, *Toxic Waste Litigation*, 99 Harv.L.Rev. 1458, 1465 & n. 1 (1986); *U.S. v. Price*, 577 F.Supp. 1103, 1107 (D.N.J.1983); *United States v. Mottolo*, 605 F.Supp. 898, 902 (D.N. H.1985) ("CERCLA has acquired a well-deserved notoriety for vaguely-drafted provisions and an indefinite, if not contradictory, legislative history."). Nonetheless, Congress intended broad judicial interpretation of CERCLA in order to give full effect to two important legislative purposes: to give the federal government the tools necessary for a prompt and effective response to hazardous waste problems and to force those responsible for creating hazardous waste problems to bear the cost of their actions. *See* S.Rep. No. 848, 96th Cong., 2d Sess. 13 (1980), *reprinted in* 1 A Legislative History of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (Superfund), at 320 (1983); H.R.Rep. No. 1016, 96th Cong., 2d Sess. pt. 1, 25 (1980), *reprinted in* 2 A Legislative History of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (Superfund), at 56 (1983); *United States v. Reilly Tar & Chemical Corp.*, 546 F.Supp. 1100, 1122 (D.Minn.1982).

After stripping section 107(a)(3) of its excess verbiage, Courts have generally held that liability under section 107(a)(3) requires proof of four basic elements: 1) that the generator disposed of hazardous substances; 2) at a facility which contains at the time of discovery hazardous substances of the kind the generator disposed; 3) there is a release or a threatened release of that or any hazardous substance; 4) which triggers the incurrence of response costs. *See United States v. Wade*, 577 F.Supp. 1326, 1333 (E.D. Pa.1983); *United States v. Conservation Chemical Co.*, 619 F.Supp. 162, 190 (W.D.Mo.1985); *United States v. South Carolina Recycling and Disposal, Inc.*, ("*SCRDI*") 14 Envtl.L.Rep. (Envtl. L.Inst.) 20272, 20274 (D.S.C.Feb. 23, 1984); *see also United States v. Ward*, 618 F.Supp. 884, 893–94 (E.D.N.C.1985).

Courts have universally acknowledged that in enacting section 107 Congress created a strict liability scheme. *See New York v. Shore Realty Corp.*, 759 F.2d 1032, 1044 (2d Cir.1985) (liability under CERCLA is unequivocally strict liability); *United States v. Conservation Chemical Co.*, 619 F.Supp. at 204; *United States v. Ward*, 618 F.Supp. at 893; *United States v. Northeastern Pharmaceutical and Chemical Co.*, ("NEPAC-CO") 579 F.Supp. 823, 844 (W.D.Mo.1984); *SCRDI*, 14 Envtl.L.Rep. at 20274, *United States v. Chem–Dyne Corp.*, 572 F.Supp. at 805; *City of Philadelphia v. Stephan Chemical Co.*, 544 F.Supp. 1135, 1140 n. 4 (E.D.Pa.1982). I am in accord with the conclusion of these courts. CERCLA section 101(32) defines CERCLA liability as being consistent with the liability standards governing section 311 of the Clean Water Act, 33 U.S.C. section 1321 (1982). *See* 42 U.S.C. section 9601(32) (1982). Courts have interpreted Section 311 of the Clean Water Act to define a standard of liability with fault. *See, e.g., United States v. LeBoeuf Bros. Towing Co.*, 621 F.2d 787, 789 (5th Cir.1980); *Steuert Trans. Co. v. Allied Towing Corp.*, 596 F.2d 609, 613 (4th Cir.1979); *United States v. Tex–Tow, Inc.*, 589 F.2d 1310, 1313 (7th Cir.1978); *Burgess v. M/V Tamano*, 564 F.2d 964, 982 (1st Cir.1977), *cert. denied*, 435 U.S. 941, 98 S.Ct. 1520, 55 L.Ed.2d 537 (1978); *United States v. Bear Marine Services*, 509 F.Supp. 710, 714 (E.D.La.1980). Moreover, the legislative history is clear that Congress understood judicial interpretations of section 311 to impose strict liability and intended that standard to be incorporated as the liability standard under CERCLA. *See* S.Rep. No. 848, 96th Cong., 2d Sess. 34 (1980), *reprinted in* 1 A Legislative History of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (Superfund), at 341 (1983) (S.1480—the CERCLA bill in the Senate—represents an attempt to fill gaps left by other federal strict liability statutes—including section 311 of CWA—which respond to and compensate victims of hazardous substance release); 126 Cong. Rec. S14964 (daily ed. Nov. 24, 1980) (remarks of Sen. Randolph) ("[W]e have kept strict liability in the compromise, specifying the standard of liability under section 311 of the [CWA]; that is, strict liability."). Thus, if the plaintiff is able to prove at trial the statutory elements of section 107(a)(3), Olin may be held liable without proof of knowledge or intent; CERCLA section 107 is a strict liability scheme.

### Rohm & Haas Company

■ It is clear that this major chemical company took every precaution in the disposal of its wastes; it was separated into categories, packed into 58 gallon metal, open-head drums ("lab packs")[3] cushioned with vermiculite and absorbent materials, and disposed of through a licensed transporter. During 1976–1977, the pertinent period here, it contracted with Jonas Waste Removal ("Jonas"), to transport its waste exclusively to licensed disposal sites in Pennsylvania and New Jersey with directions stating, "[d]isposal of these waste materials is not to be in violation of an ordinance, regulation or law of responsibility for safe delivery and disposal of the material after leaving (the premises)." And as the defendant states, it is uncontradicted that at no time was any material consigned to Rhode Island. However, during this period approximately 4,800 fifty-five gallon lab packs were consigned to Jonas and the state claims 303 five-gallon drums of this total were found at the Picillo site; the defendant argues that this is an uncorroborated statement nowhere to be found in the record. The fact remains that this defendant agreed to have its materials removed. The record shows it "paid the State's contractor approximately $32,000 as the costs for handling the removal of Rohm & Haas materials." Certainly this is an indication of the quantity of waste removed. The removal and identification of this material was with the assistance of a Mr. Joseph Pawlikowski of Rohm & Haas, who was the superior responsible for that company's waste disposal.

In mitigation, the defendants point out that 20 drums, which were segregated in one area, were intact without any observable leakage. However, this was disputed by John Leo, an employee of the State Department of Environmental Management. The defendant also points to Mr. Leo's testimony that Rohm & Haas, "removed all of their toxic waste that could be

### C. Defenses to Liability under CERCLA Section 107

#### 1. Statutory Defenses

CERCLA section 107(b) enumerates the only defenses to CERCLA liability provided within the statute itself. Only three statutory defenses are available to a defendant otherwise liable under CERCLA. Section 107(b) provides:

> There shall be no liability under sub-section (a) of this section for a person otherwise liable who can establish that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by—
> (1) an act of God;
> (2) an act of war;
> (3) an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant (except where the sole contractual arrangement arises from a published tariff and acceptance for carriage by a common carrier by rail), if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances, and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions; or (4) any combination of the foregoing paragraphs.

42 U.S.C. section 9607(b) (1982). In essence, the affirmative defenses outlined in section 107(b) will allow a defendant to evade liability if the release and damage are caused solely by an act of God, or war, or by acts of third parties outside a contractual relationship with the defendant. A defendant may only defend based on the acts of a third party if the defendant has exercised due care in the respect to the hazardous substances concerned and took precautions against any acts or omissions of the third party and any consequences foreseeably flowing from those acts or omissions. This final defense, known as "the third-party defense," incorporates general principles of vicarious liability into the CERCLA liability scheme. See Developments, Toxic Waste Litigation, 99 Harv.L.Rev. 1458, 1548 (1986).

The defenses provided in section 107(b) are very narrow defenses; they require that the release and damage be caused solely by acts of God, war, or acts of omissions of a third party. These affirmative defenses essentially serve to shift the burden of the proof of causation to the defendants. This causation scheme encourages defendants to mark and dispose of their hazardous wastes with the greatest care; the defenses discourage defendants from carelessly allowing their wastes to run into one large, unidentifiable morass at the waste site, confident in the knowledge that the government must identify the wastes and prove causation. See id. at 1544.

**3.** Laboratory packs ("lab packs") are 55 gallon drums packed with smaller containers (e.g., vials, jars) surrounded and cushioned by an absorbent material such as vermiculite or "speedy dry."

removed." The defendant did not go far enough because Mr. Leo also stated, in answer to a question as to what was left, "[w]hich left the contaminated soil from the broken bottles that had leaked out into the pit from their lab packs. That, of course, was lost in the environment which would have added to the contamination in the groundwater." He further said that he personally saw removed from the pit "at least four or five drums" containing liquid which was spilled because the drum heads were crushed and had holes on the side caused by the bulldozer. "They were eventually shown to be Rohm & Haas material ... [t]hose drums were Rohm & Haas drums." One of the drums contained allyl alcohol, which is a flammable, extremely poisonous material; "[T]hey [representatives from Rohm & Haas] were shown the barrel that contained nothing but this allyl alcohol ... this material is extremely poisonous ... a class B poison and by DOT regulations as class B poison is extremely dangerous material."

The material spilled into the ground was removed as contaminated soil. Mr. Leo could not state what quantum of soil was contaminated by this defendant; though he did know the total amount of soil removed; but, "[h]ow much is actually responsible from Rohm & Haas or whatever other companies are involved I can't tell you. I mean we didn't proportion out the soil."

I accept the State's estimate as to the quantum of material found at the dump and that it was toxic hazardous waste. Accordingly, this defendant is liable to the state as set forth, *infra*.

*Exxon Research and Engineering Company*

■ The State contends that 15 Exxon drums were excavated; Mr. Leo so testified; however, he also acknowledged that the number was based on his recollection and not his records, which identified only one Exxon "lab pack"; this single drum was rusted and dented without any evidence of spillage. When pressed for records corroborating his testimony of 15 drums, he stated, "I cannot point to any one record. It's made up of film, photo-

graphs, my own visible ... seeing barrels at the site, and everything else. No record was made ... I was asked by the Attorney General's office to put together an estimation of the number of barrels found. That's what I did, and that was based on my records, the amount of material, my own recollection as being there on site for the number of barrels that were there." The culmination of his testimony was the acknowledgement that there were no corroborating records; the number 15 was based on his best recollection. The defendant developed, as it states in its Memorandum at 32, that "[i]ndeed, during his [Leo's] deposition in March 1985, Mr. Leo himself testified that he saw only one drum ... the contents of which were identifiable to Exxon." Another witness, Alan Brodd, testified for the State. He was the site supervisor who was on the site on a daily basis during the excavation in question. He had "overall responsibility for the site safety and the day-to-day operation and activities at the site." His duties required him to sample, analyze, and interpret results of such samplings and make judgments as to whether or not the materials were hazardous. He testified he saw twenty or thirty half pint or pint bottles that bore Exxon labels.

The State's reply to the foregoing is: "Although Mr. Brodd saw only one lab pack attributable to Exxon ... Mr. Brodd's managerial position did not permit him to have the type of direct, regular involvement in the excavation activities over which John Leo had primary responsibility." Plaintiff's Reply Memorandum at 18.

Exxon utilized the services of a transporter licensed by the State of New Jersey and the Federal Government; in addition, Exxon personnel visited the disposal sites of its transporters to be assured of their adequacy. At one of the sites the transporter insured that the wastes were removed from their lab packs and incinerated; at this same site, procedures were employed to verify receipt of all the waste to be disposed of and incinerated. Exxon never deliberately sent any of its material to

the Picillo site nor did it ever utilize any of the transporters who used the site.

I find Exxon employed every precaution to prevent the illegal and/or improper disposal of its waste. Nevertheless, I must also find that twenty or thirty bottles, as described *supra,* were found at the site. However, although there was testimony at trial that the Exxon materials were "probably flammable," no further proof of toxicity was offered. Accordingly, I find that the State has not met its burden of proving the material allegedly found by Brodd was hazardous within the meaning of CERCLA. Judgment must be entered for this defendant.

*American Cyanamid*

■ Mr. Leo testified that he believed or recalled that, "there were ten drums from American Cyanamid based on going through the records and personally being there and seeing the drums." He copied the data recorded on the labels of containers found at the site and contacted Dr. Ralph Wainwright, supervisor of waste disposal at American Cyanamid, who, using the code numbers found on the labels, identified the material as coming from their Agricultural Division, which "makes poisons and pesticides in New Jersey." Mr. Leo then talked to a Dr. Luke of American Cyanamid and, based upon that conversation and conversations with Dr. Wainwright, testified that, "based on what I had—based on the code numbers that I was giving them the material was poison 'B', again, very toxic material [such as] experimental pesticides and toxins used in ... veterinarian supplies for worms and so forth and cows and pigs and that the other material was a catalytic resin." A partial record was made of the day and date of these phone calls as well as of the code numbers. These records were made available to the defendants.

The plaintiff does not dispute the following facts:

During 1977, Ralph Wainwright was supervisor of industrial hygiene and safety at American Cyanamid and was responsible for disposal of wastes generated at its laboratory. All wastes were labeled with code

names and generic descriptions. Wastes were sorted into categories at each laboratory and a form prepared accurately describing each waste and the container in which it was placed. Mr. Wainwright reviewed copies of these forms to assure that they were completed and the waste properly described. Once he was satisfied, the materials were collected and brought to a storage area where they were packed into 55 gallon steel drums to form lab packs, using vermiculite as an absorbent material. Each drum contained sheets showing precisely what materials were packed therein. Each drum contained compatible materials, e.g. flammables, liquids, solids, poisons, corrosives, etc. Each drum was labeled on the outside with information relating to the company and location, a bright symbol and writing to indicate the type of hazardous material, and the number of the drum. In sum, every effort was made to properly label and identify these drums and their contents. The drums were then manifested and picked up by a transporter.

During the period 1970–1977, American Cyanamid used one transporter extensively for lab pack material, Chemical Control Corporation of Elizabeth, New Jersey, and two others on certain occasions (water-reactive wastes and PCBs were handled specially). Pursuant to company policy, Mr. Wainwright visited the Chemical Control facility to make sure that wastes were handled properly. He visited the site on three occasions between 1972 and 1977. Lab packs were to be incinerated. He inspected the incinerator. He inspected the licenses. He was satisfied that the facility was a proper one for the disposal of American Cyanamid wastes.

■ The state does not take issue with American Cyanamid's claimed diligence in the selection of its transporter. Nor, in fact, do I. Unfortunately for American Cyanamid, however, this line of argument gets it nowhere. As I ruled in *Violet,* 648 F.Supp. at 1290–93, and as I reaffirm *infra,* the strict liability scheme of CERCLA imposes liability upon generators even though they may have taken precautions in selecting what appeared to be a responsible

transporter. Moreover, as a purely factual matter, it is not at all clear that American Cyanamid was as vigilant as it contends. American Cyanamid had an exclusive contract with the Chemical Control facility to handle all of its hazardous waste, including its PCB waste. It continued to utilize the services of this organization despite the presence of an excessive number of drums on the Chemical Corporation site, which in the words of Ralph Wainwright who, as an American Cyanamid Company's supervisor of industrial hygiene and safety, was responsible for disposal of wastes, "bothered everybody". In addition, American Cyanamid Company made no further inquiries concerning Chemical Control despite the fact that Mr. Wainwright was aware of an incident in which Chemical Control was linked to barrels of waste which had been improperly disposed of on a vacant lot in Newark, New Jersey.

I find that this defendant is responsible for ten drums of toxic hazardous material found at the site. Accordingly, this defendant is liable to the State as set forth, *infra.*

*Olin Corporation*

The following facts are undisputed:

■ Richard S. Henley, manager of regional environmental affairs for Olin, visited the Picillo site on June 22, 1982. At this time, Mr. Leo showed him five 55–gallon drums as having come from Olin. All but one of these drums either had a label of a product manufacturer addressing the drum to Olin, or the marking "Poly–G," an Olin trade name. Mr. Henley was also shown a five gallon pail with a label designation "fatty acid" and a small cardboard container which contained four 4–inch vials—intact and not leaking. Mr. Henley did not identify the contents of other drums or containers. No PCBs (Polychlorinated Biphenals) at the site are attributable to Olin.

I conclude that Olin was the generator of the contents of the five fifty-five gallon drums, the five-gallon pail, and the cardboard container.[4] The question still pending is whether the plaintiff has carried the burden of proving the material was hazardous; all that the plaintiff offers on this point is its statement in its brief that "[t]he degree of toxicity of the individual waste may not have been determined but its status as a hazardous waste was confirmed by Mr. Leo through the code numbers on the waste and his discussions with Defendant representatives." The pertinent portion of the transcript reference merely reflects Mr. Leo's testimony that though samples of the materials were taken, no analysis was done and he could not identify the contents of the drums. When asked how, absent any analysis, he could label the material toxic, he replied, "[b]ased on the information on the outside of the label … on the drum, and based on conferring with Olin representatives when they came out to the site to look at some of the drums."

As against this, the defendant presented the testimony of Dr. Steven Barber, Manager of Toxicology at Olin who stated that polyol, which was found in the 55–gallon drums, is not a hazardous substance as defined in section 101(14) of CERCLA. Dr. Barber also testified that Taluene diisocyanate (TDI), when exposed to water, forms polyurea, which is not a hazardous substance as defined under CERCLA, and that fatty acids are also not a hazardous substance under CERCLA.

This testimony was not refuted. I cannot accept Mr. Leo's general statement as sufficiently probative to find that Olin's material was hazardous. Accordingly, I find that the State has failed to prove that

---

**4.** I do not find the reasoning, and indeed the briefs, without confusion as to precisely what amount of material can be attributed to Olin. In addition to the 5 fifty-five gallon drums, there appears to have been another barrel designated as barrel 115 which contained a one gallon container; a cardboard box and a one quart container—all intact and contents unknown. There is reference also to a one pint container— intact; another seven drums labelled as containing "POLY–G," "ISOCYANATE RESIN," "RESINOUS MATERIALS," or "TDI–80."

I note that the facts developed at the hearing are not precisely as recited in my Opinion and Order of November 20, 1986, ruling on defendant Olin's motion for partial summary judgment. These facts are based on the evidence as developed at trial and are controlling.

the Olin materials were hazardous substances under CERCLA.

Judgment must be entered for this defendant.

*Hydron Laboratories, Inc.*

■ This defendant generated a sodium aluminum hydride product known as Vitride which is a hazardous toxic material. In all of 1977, this defendant had a total of 28 barrels of its sodium aluminum hydride waste delivered to Chemical Waste Removal, Inc., a transporter for disposal. Twenty-one of these barrels were found at the site in question. The testimony is quite clear that nineteen of the barrels were intact, i.e., not leaking, and that two had pin holes which caused miniscule leaking of a few drops. The plaintiff argues that "several of the Hydron barrels suffered perforations ranging in size from pin hole-leaks to a hole the diameter of a dime" but offers no transcript reference supporting this statement. Mr. Leo's cross-examination is of no help to the plaintiff, rather it corroborates the defendant's contention of no leakage excepting for the pin holes. And the testimony established that "emission through small 'pinhole' leaks in drop quantities would result in evaporation so quickly that it could not pose any threat." I find that twenty-one barrels of Hydron toxic hazardous waste with miniscule leaking were found at the site.

I find this defendant did not contribute to the Picillo dump contamination but that the Hydron barrels posed a threatened release of the hazardous substance they contained. I find them liable.

IV. SCOPE OF LIABILITY

■ It is now quite well settled that liability under CERCLA is joint and several. *See, e.g., United States v. South Carolina Recycling and Disposal, Inc.,* 653 F.Supp. 984, 992 (D.S.C.1986); *Idaho v. Bunker Hill Co.,* 635 F.Supp. 665, 676 (D.Ind.1986). If the injury is indivisible, then each defendant is responsible for the entire cost. *United States v. Chem–Dyne Corp.,* 572 F.Supp. 802, 811 (S.D.Ohio 1983). If, however, the injury is divisible or there is nonetheless a reasonable basis for division according to the contribution of each, then liability will be apportioned accordingly. Restatement (Second) of Torts sections 433A & 881 (1976). The defendant carries the burden of demonstrating that the injury is divisible or otherwise subject to apportionment. *United States v. Dickerson,* 640 F.Supp. 448, 450 (D.Md.1986).

The defendants assert that there are two supportable ways to apportion liability. The first involves segregating the Picillo site essentially into four separate and distinct harms correlating with the four stages of the clean up. The second involves focusing on the volumetric contribution of each defendant as indicated by the number of drums attributable to each found at the site.

The cleanup of the Picillo site began in 1979 and lasted until 1982. As this litigation proceeded, the four years of excavation became known as four separate "phases": phase O represented the work completed in 1979, phase I represented the work completed in 1980, and so on. Each phase, moreover, involved work on different areas of the site. During phase I, for example, which spanned 1980, a trench in the northeast area of the site was excavated. Phases II and III, which followed, involved excavation of trenches in the northwestern, western, and southern areas of the site. The state retained different contractors for each phase.

■ The defendants now urge that liability should be apportioned according to these four separate phases. They contend, for example, that because neither Rohm & Haas nor American Cyanamid drums were discovered during phases O or I, the costs of cleanup during these phases should be excluded from any liability calculation and the actual liability to these defendants should be reduced accordingly.

I have trouble with this argument. The fact that the cleanup of the Picillo site proceeded in four stages does not necessarily render the underlying injury divisible. In fact, the manner in which the state conducted the cleanup, whether in one, two, or a hundred stages, is practically and theo-

retically immaterial to the question of whether the devastated state of the Picillo property can be divided into distinct harms.

In fact, the defendants acknowledge in their brief that this is an untenable basis for apportioning liability. After suggesting that dividing liability among the phases is a rational way to apportion costs, they in fact reject this method when they describe its application. For example, defendants refer to phase III, during which 3300 drums of toxic waste were discovered, and contend that of that number, only 24 are attributable to Rohm & Haas. They contend that since that number constitutes .07% of the total, Rohm & Haas should be liable for .07% of the costs of Phase III. It is clear from this that the various phases of the cleanup are virtually irrelevant to the proferred apportionment calculation and the defendants seek to apportion liability solely on the basis of the number of drums found at the site.

Finally, dividing the costs solely on the basis of which phase the defendant's waste was discovered is inconsistent with recent decisions concerning the scope of liability under CERCLA. As one court held:

A CERCLA defendant's liability under section 107(a) is not restricted to the cleanup of those hazardous substances directly attributable to it. Rather, once the Government has proven that a defendant's waste is present at a site and that the waste contains hazardous substances, the defendant may be held jointly and severally liable for the entire cost of removal and remedial actions required at the site not inconsistent with the National Contingency Plan.

*United States v. New Castle County,* 642 F.Supp. 1270, 1276 (D.Del.1986). The defendant's second proffered basis for apportionment, which, it appears, is implicit in the first, is to divide liability according to the number of drums found at the site that can be attributed to the defendants. They argue that a defendant who has contributed, say, one per cent of the total number of drums should be liable for one per cent of the costs of cleanup.

There is no question that the number of drums may be an appropriate criterion for apportioning liability if all of the drums contained identical wastes. *See Developments, Toxic Waste Litigation,* 99 Harv.L. Rev. 1458, 1528 (1986). In such a case, there is "the reasonable assumption that the respective harm done is proportionate to that number." Restatement (Second) of Torts section 433A, comm. d (1976). However, "the volume of waste of a particular generator is not an accurate predictor of the risk associated with the waste because the toxicity or migratory potential of a particular substance generally varies independently of the volume." *Chem–Dyne Corp.,* 572 F.Supp. at 811.

Thousands of dented and corroded drums containing a veritable potpourri of toxic fluids were discovered at the Picillo site. Many were found intact but many had ruptured spilling chemicals into the soil. Some were discovered empty, having already discharged their contents. I find that it is simply impossible to determine which defendant's waste contributed in what specific manner to the releases and continuing threat of further releases. Under these circumstances, where different substances possessing different qualities of toxicity and migratory potential commingle, there is a synergistic impact upon the environment that necessitates a finding that the consequent injury is indivisible. *See United States v. Stringfellow,* 661 F.Supp. 1053, 1060 (C.D.Cal.1987); *United States v. South Carolina Recycling and Disposal, Inc.,* 653 F.Supp. 984, 994 (D.S.C.1984). I therefore hold that the injury to the Picillo site is indivisible and the defendants are jointly and severally liable for the costs of the cleanup.

I am not insensitive to the possible unfairness involved in holding a few relatively small contributors jointly and severally liable for the entire harm. Indeed, there is no question that in CERCLA actions, like other actions involving joint tortfeasors, a court may consider equitable factors to apportion damages and mitigate the effects of joint and several liability. I believe, however, that issues of fairness and equitable apportionment may be more proper-

ly addressed in a subsequent contribution action, which apparently Rohm & Haas and American Cyanamid have already begun. *See* Restatement (Second) of Torts section 881(1) & (2) ("equitable shares of the liability with respect to an indivisible injury are appropriately resolved in an action for contribution").

This is consistent with CERCLA's key objective of "facilitat[ing] the prompt cleanup of hazardous dumpsites by providing a means of financing both governmental and private responses, and by placing the ultimate financial burden upon those responsible for the danger." *City of Philadelphia v. Stephan Chemical Co.*, 544 F.Supp. 1135, 1142–43 (E.D.Pa.1982). By delaying thorny considerations of equitable apportionment to a later contribution proceeding, the government is provided immediate funds after the initial liability hearing to take prompt remedial action at the earliest opportunity. Garber, *Federal Common Law of Contribution Under the 1986 CERCLA Amendments*, 14 Eco.L.Q. 365, 369 (1987). In most instances, immediate response to potential disasters caused by seepage and migration can forestall the accrual of considerably higher compensation costs. Note, *Allocating the Costs of Hazardous Waste Disposal*, 94 Harv.L. Rev. 584, 587 (1980). As one court has observed:

> It is helpful to note that the purpose of CERCLA is environmental protection, including protection of public health and safety. Imposing joint and several liability carries out the legislative intent by ensuring that responsible parties will fulfill their obligations to clean up the hazardous waste facility. The court has discretion to use equitable factors in apportioning damages in order to mitigate the hardships of imposing joint and several liability upon defendants who have only contributed a small amount to a potentially large indivisible harm. However, the court's discretion in apportioning damages among the defendants during the contribution phase does not effect the defendant's liability.

*Stringfellow*, 661 F.Supp. at 1060; *see also United States v. New Castle*, 642 F.Supp.

1258, 1277 (D.Del.1986) ("CERCLA places the burden of apportioning blame on the defendants by way of actions for contribution and apportionment.").

## V. DEFENSES

### *Unclean Hands*

In *Violet*, I held that because plaintiffs in CERCLA actions seek the equitable remedy of restitution, defendants were entitled to raise equitable defenses. 648 F.Supp. at 1294–95. The defendants argue in their post-trial brief that the first stage of the Picillo cleanup was mishandled and that the doctrine of unclean hands consequently bars the state from recovering the cost of the cleanup.

The evidence presented during trial revealed that the so-called phase I excavation was characterized by inadequate record-keeping and possibly improper removal methods, which resulted in excess spillage. Testimony indicated that the state's contractor for phase I, Jet Line Services, Inc. (Jet Line), a novice at this sort of venture, used backhoes with teeth to excavate the drums, often puncturing the drums and causing their contents to spill onto the ground. Testimony by one of the defendant's experts indicated that more appropriate methods, including the use of barrel grapplers, which have been available for decades, could have prevented much of the spillage. There was also evidence that Jet Line was initially compensated on a per-drum basis, encouraging haste without regard to safety and conservation. Only after many drums had been destroyed in the process did the State finally amend the contract to force Jet Line to employ less destructive methods. Finally, if records were kept during phase I, and it is conceivable that as a result, some generators are not now before this court.

In defense, the state points to testimony that spillage is inevitable in any cleanup project. One of the state's employees testified that such hazardous waste cleanup projects were just beginning at the time phase I was conducted and thus the "state-of-the-art was at a fledgling level." As to this contract with Jet Line, the state con-

tends—and testimony supports its contention—that it agreed to Jet Line's per-drum compensation scheme because an independent consulting corporation had estimated that there were only a few hundred barrels of waste to be removed. Later, when it became clear that there were thousands more barrels than anticipated, the state amended the compensation schedule and threatened to close down the project unless Jet Line improved its methods.

The doctrine of unclean hands is a recognition of the maxim that "he who seeks equity must do equity." Rather than constituting a defense to liability in the traditional sense, the doctrine is applied in the public interest and to protect the integrity of the court by foreclosing the possibility that the court will assist a wrongdoer. As one court described the doctrine:

> In the interests of right and justice the court should not automatically condone the defendant's infractions because the plaintiff is also blameworthy, thereby leaving two wrongs unremedied and increasing the injury to the public. Rather the court must weigh the substance of the right asserted by the plaintiff against the transgression which, it is contended, serves to foreclose that right. The relative extent of each party's wrong upon the other and upon the public should be taken into account, and an equitable balance struck.

*Republic Molding Corp. v. B.W. Photo Utilities*, 319 F.2d 347, 350 (9th Cir.1963). Evidence of some misconduct by the plaintiff, therefore, is not an automatic bar to recovery; rather, a district court has "wide latitude to compare the cleanliness of the parties 'hands'." *United States v. Zenon*, 711 F.2d 476, 478 (1st Cir.1983) *see also Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 815, 65 S.Ct. 993, 997, 89 L.Ed. 1381 (1945) (the unclean hands doctrine "necessarily gives wide range to the equity courts use of discretion in refusing to aid the unclean litigant. It is not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion.").

After carefully considering the state's conduct during the early stages of the cleanup, I conclude that it does not so soil the state's hands that recovery is barred in this action. My conclusion is informed not only by a balancing of the equities in this case, but also by the simple fact that courts have uniformly held that mere negligence on the part of the plaintiff is insufficient to bar relief under the unclean hands doctrine. *See Shearson/American Express, Inc. v. Mann*, 814 F.2d 301, 307 (6th Cir. 1987); *Pfizer, Inc. v. Int'l Rectifier Corp.*, 685 F.2d 357, 359 (9th Cir.1982), *cert. denied*, 459 U.S. 1172, 103 S.Ct. 818, 74 L.Ed. 2d 1016 (1983); *International Union, Etc. v. Local Union No. 589*, 693 F.2d 666, 672 (7th Cir.1982); *Bresh v. Braecklein*, 133 F.2d 12, 14 (10th Cir.1943). Therefore, even if I were to conclude that the state was negligent during the initial stage of the cleanup, that conclusion would be insufficient to trigger application of the doctrine of unclean hands.

*Third–Party Defense*

CERCLA section 107(b), in relevant part, provides:

> There shall be no liability under subsection (a) of this section for a person otherwise liable who can establish that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by—
>
> .　　.　　.　　.　　.
>
> (3) an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant....

42 U.S.C. section 9607(b). A defendant may invoke this defense if he can also show that he "exercised due care with respect to the hazardous substances concerned and took precautions against any acts or omissions of the third party and any consequences foreseeably flowing from those acts or omissions." *Violet*, 648 F.Supp. at 1293; *see* 42 U.S.C. section 9607(b)(3)(a)–(b).

■ The defendants argue that they are entitled to this defense because they consigned their wastes to licensed waste

transporters and there is no evidence that these transporters had any contact with the Picillo site. Therefore, they contend, "whatever party was responsible for transporting the [defendants'] waste to the Picillo site had no direct relationship with [the defendants] and there is no evidence of any other relationship, indirect or otherwise."

I find that the defendants have failed to meet the initial showing that the release was caused solely by a party that did not have either a direct or indirect contractual relationship to the defendants. The simple fact is that during the time the defendants consigned their waste to licensed disposers, some of that waste, in indentifiable containers, came to rest at the Picillo site. The defendant's argument that there was no evidence linking the disposers to the site or that the defendants had any relationship with whomever actually deposited the waste there simply confuses the nature of its burden under the third-party defense. As I stated in *Violet,* the third-party defense "essentially serve[s] to shift the burden of proof of causation to the defendants." 648 F.Supp. at 1293. The defendants must demonstrate by a preponderance of the evidence that "a *totally unrelated third party* is the *sole* cause of the release." *Stringfellow,* 661 F.Supp. at 1053; *see Dedham Water Co. v. Cumberland Farms Dairy, Inc.,* 805 F.2d 1074, 1079 n. 10. (1st Cir.1986). Absent any evidence along these lines, I must conclude that it is equally likely that either the licensed disposers or a subcontractor of the disposers deposited the waste at the site.

The defendant's argument appears to be a repackaging of the argument that a generator can escape liability merely by showing that it had in fact arranged to have its waste dumped elsewhere. This argument, however, was not only rejected in *Violet, see* 648 F.Supp. at 1291, but by other courts as well. *See, e.g., United States v. Ward,* 618 F.Supp. 884, 895 (E.D.N.C.1985) (section 107 does not require that the arrangement include knowledge of the ultimate disposal site); *Missouri v. Independent Petrochemical Corp.,* 610 F.Supp. 4, 5 (E.D. Mo.1985) (generators may be liable for costs at site though it expressly arranged

to have its wastes delivered to another facility); *United States v. Conservation Chemical Co.,* 619 F.Supp. 162, 234 (W.D. Mo.1985) (same).

*National Contingency Plan*

Persons held liable under section 107(a) of CERCLA are responsible for "all costs of removal or remedial action incurred ... not inconsistent with the National Contingency Plan." 42 U.S.C. 9607(a). The Plan is set out in 40 C.F.R. Part 300, and in effect requires that the clean-up measures be cost effective. 42 U.S.C. 9605(7); 40 C.F.R. section 300.68(j); *see J.V. Peters & Co., Inc. v. Administrator, E.P.A.,* 767 F.2d 263, 265 (6th Cir.1985); *United States v. United Nuclear Corp.,* 610 F.Supp. 527, 529 (D.N.M.1985).

Defendants argue that the state has failed to prove that its actions were consistent with the Plan. Specifically, they allege that Phase I of the cleanup was characterized by sloppy and inefficient practices that were not cost effective.

■ As an initial matter, I hold that when a state government is pursuing response costs under CERCLA, the burden of proving that the cleanup was inconsistent with the Plan rests with the defendant. As one district court persuasively reasoned:

Defendants argue that the plaintiff failed to prove that the costs incurred were reasonable and "not inconsistent with the national contingency plan." Initially, the Court finds that the burden of proving inconsistency with the national contingency plan was that of the defendants. This conclusion is evidence from the language of the statute. To give meaning to every term in the statute, the Court reads the insertion of the word "not" immediately prior to "inconsistent" to mean that the defendants are presumed liable for all response costs incurred unless they can overcome this presumption by presenting evidence of inconsistency. The content of section 107(a)(4)(B) lends support to this conclusion in stating that responsible parties are liable for "any other costs of response incurred by any other person *con-*

*sistent with* the national contingency plan." (emphasis added) On its face, section 107(a)(4)(B) intends that a different standard apply to cost recovery by non-governmental entities and that such entities must affirmatively show that their actions were consistent....

*United States v. Northeastern Pharmaceutical and Chemical Co.,* 579 F.Supp. 823, 850–51 (D.Mo.1984); *see United States v. South Carolina Recycling and Disposal, Inc.,* 653 F.Supp. 984, 1009 (D.S.C.1986).

It is also clear from the statute that variance from the Plan does not provide a complete defense to liability. By its own terms, Section 107(a) bars "costs" that are inconsistent with the Plan, not "actions." *See, e.g., Lone Pine Steering Comm. v. United States,* 600 F.Supp. 1487, 1499 (D.N.J.), *aff'd* 777 F.2d 882 (3d Cir.1985). Therefore, the defendants have the burden of demonstrating that the clean-up, because of some variance from the Plan, resulted in demonstrable excess costs for which they should not be responsible.

■■■ The trouble with the defendant's claim in this regard is that while they have presented evidence that the use of barrel grapplers, for example, or the employment of a different compensation scheme for the contractor, would have prevented some of the spillage that occurred during Phase I, they have not presented any evidence addressing how much of the recovery costs incurred by the state, as a result, should be precluded. While I am not unsympathetic to the defendants' plight, I refuse to speculate as to how much recovery is too much. Accordingly, I find that the defendants have failed to prove that certain costs were inconsistent with the National Contingency Plan.

### Retroactive Application of CERCLA

■■■ The defendants argue that the releases for which they are now being held to answer occurred prior to 1980, the effective date of CERCLA. They contend that to hold them liable for such conduct consti-

tutes retroactive application of a statute in violation of due process. This argument has been thoughtfully analyzed and rejected by numerous courts. *See United States v. South Carolina Recycling and Disposal, Inc.,* 653 F.Supp. 984, 996–98 (D.S.C. 1986); *United States v. Shell Oil Co.,* 605 F.Supp. 1064, 1072–73 (D.Col.1985); *United States v. Northeastern Pharmaceutical and Chemical Co., Inc.,* 579 F.Supp. 823, 839–43 (D.Mo.1984); *State ex rel. Brown v. Georgeoff,* 562 F.Supp. 1300, 1309–1314 (N.D.Ohio 1983). I adopt the reasoning and conclusion of these courts and hold that liability for response costs under CERCLA for releases which occurred prior to 1980 does not offend due process.

## VI. SETTLEMENTS AND FUTURE LIABILITY

### Effect of Settlements

■■■ On the day designated for trial, the State and the United States Environmental Protection Agency, a non-party, settled with numerous potential defendants. That settlement included a $2.3 million cash settlement to be applied to the past costs of the entire clean-up, as well as commitments from the settling defendants to perform future remedial work valued at $3.5 million. Of this, the State was to receive twenty-five per cent of the cash settlement, or $575,000.00.[5] The State also independently settled with other defendants for $46,500, bringing the total amount of settlement proceeds to the state to $621,500.00.

A provision of the 1986 SARA amendments provides:

A person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement. Such settlement does not discharge any of the other potentially liable persons unless its terms so provide, but it reduces the potential

---

5. The state used the figure $565,625.00 in its brief. I assume that this is a typographical error since 25% of 2.3 million is $575,000.00.

liability of the others by the amount of the settlement.

42 U.S.C. section 9613(f).

I conclude that under the express language of the statute the total liability for past response costs must be reduced by the amount the state received in cash settlement, i.e., $621,500.00. Therefore, Rohm & Haas, American Cyanamid, and Hydron are liable for past response costs in the amount of $991,937.30.

The settlement also included a commitment by the settling defendants to perform future remedial work at the site. This work was valued at $3.5 million and involves the removal of the three piles of soil totaling 6,500 cubic yards which had been found to contain PCB's and phenols. The defendants contend that the dollar value of this settlement arrangement must be applied to reduce their past response cost liability because there was no proof that the PCB pile constituted a hazardous waste that must be removed from the Picillo site. They point out, for example, that there was uncontradicted testimony that the average concentration of the PCB pile was only about 36 parts per million and that under applicable state and federal regulations removal is not required below concentrations of 50 parts per million. Therefore, they argue, since removal of these piles is not actually required by law, the value of the agreed-upon removal, $3.5 million, must be applied to the response cost, thereby in effect satisfying all of the state's clean-up costs.

I reject this argument for the simple reason that the state's success in negotiating a settlement as to the PCB and phenol piles at the site is irrelevant to the costs incurred during the initial excavation of the numerous drums and contaminants during the four stages of the clean-up. There is no question that a CERCLA plaintiff may settle with other potentially responsible parties for particular remedial action that is distinct from other response costs. *See United States v. Northeastern Pharm. & Chem. Co.*, 579 F.Supp. 823, 831–32 (W.D. Mo.1984). Moreover, I fail to see why the fact that the settling defendants may not

have been shown ultimately to be responsible for removing the contaminated soil piles has any significance. As one court confronted with a similar issue put it:

Of course, the future may ultimately reveal that the settling generators have compensated the federal government for claims on which the government would not have prevailed. This is simply the risk inherent in all settlements.

*United States v. Wade,* 577 F.Supp. 1326, 1337 (E.D.Pa.1983).

*Declaratory Judgment As To Future Liability*

The state seeks a declaratory judgment seeking entitlement to recover its future response costs associated with the Picillo site. It argues that toxic chemicals have been released into the groundwater and that the EPA is currently conducting extensive testing as to any possible damage that would require response costs.

I believe that this is an appropriate case for declaratory judgment. The issues have been firmly established and there is a real, present controversy between the plaintiff and defendants. *See C. Wright & A. Miller, Federal Practice and Procedures* section 2759 (2d ed. 1983); *Conservation Chem. Co.,* 619 F.Supp. at 211. Further, the courts are unanimous that declaratory judgments as to future removal costs are consistent with CERCLA's purpose of encouraging prompt, remedial action. *See e.g., id.* at 211–12; *Northeastern Pharm. & Chem. Co.,* 579 F.Supp. at 852–53; *Georgeoff,* 562 F.Supp. at 1316.

Accordingly, I conclude that the defendants are jointly and severally liable for all future costs of removal or remedial action incurred by the state relative to the Picillo site that are not inconsistent with the National Contingency Plan. This ruling includes any costs associated with the removal of the contaminated soil piles which the state may incur despite commitments by the settling defendants to remove the piles. I recognize that defendants have argued forcefully that they did not contribute PCB's or phenols to the Picillo site. However, because I have ruled that the defend-

ants are jointly and severally liable for the Picillo disaster, it follows that they are liable for all response costs associated with it. *See New Castle County*, 642 F.Supp. at 1319 (a CERCLA defendant's liability, once it is found that the injury is indivisible, "is not restricted to the cleanup of those hazardous substances directly attributable to it.").

## VII. CONCLUSION

In conclusion, I hold that Rohm & Haas, American Cyanamid, and Hydron are jointly and severally liable for past response costs totaling $991,937.30. I also hold that these defendants are jointly and severally liable for all future costs of removal or remedial action incurred by the state relative to the Picillo site that are not inconsistent with the National Contingency Plan; this includes any costs associated with the removal of the contaminated soil piles, *supra* Section VI, which the state may incur despite commitments by the settling parties to remove the piles.

The plaintiff will prepare an order in accordance with this opinion.