**REICHHOLD CHEMICALS,
INC., Plaintiff,**

**v.**

**TEXTRON, INC., Tennessee Gas Pipeline Co., Archer–Daniels–Midland Co., Armstrong World Industries, Inc., Burlington Northern Railroad Co., Quantum Chemical Corp., and John Does Numbers 1 through 15, Defendants.**

No. 92–30393–RV.

United States District Court,
N.D. Florida,
Pensacola Division.

May 17, 1995.

H. Edward Moore, Jr., Moore, Hill & Westmoreland, Pensacola, FL, Lawrence P. Schnapf, Pro Hac Vice, Gary T. Grassey, Pro Hac Vice, Lord Day & Lord, Barrett Smith, Douglas R. Hirsch, Pro Hac Vice, William A. Ruskin, Pro Hac Vice, Schulte, Roth & Zabel, New York City, for Reichhold Chemicals, Inc.

James M. Wilson, Wilson, Harrell & Smith, P.A., Pensacola, FL, Daniel H. Squire, Pro Hac Vice, Amey C. Winterer, Pro Hac Vice, Wilmer, Cutler & Pickering, Washington, DC, for Textron Inc.

Kathryn B. Nixon, Pro Hac Vice, Ackerman, Senterfitt & Eidson, Orlando, FL, William H. Farley, Jr., Rebecca L. Raftery, Pro Hac Vice, Jenner & Block, Chicago, IL, for Tenneco Inc.

Kathryn B. Nixon, Pro Hac Vice, Ackerman, Senterfitt & Eidson, Orlando, FL, Robert A. Emmanuel, Emmanuel Sheppard & Condon, P.A., Pensacola, FL, William H. Farley, Jr., Rebecca L. Rafferty, Pro Hac Vice, Jenner & Block, Chicago, IL, Deirdre M. Mullen, Sarah E. Davies, Pro Hac Vice, Morgan, Lewis & Bockius, Philadelphia, PA, Stephen Leermakers, Pro Hac Vice, Ashland Chemical Co., Div. of Ashland Oil, Inc., Columbus, OH, James A. Dixon, Jr., Collins, Shipman & Lucas, Tallahassee, FL, for Tennessee Gas Pipeline Co.

Robert P. Gaines, Beggs & Lane, Pensacola, FL, for Burlington Northern R. Co.

Keith E. Rounsaville, Keith E. Rounsaville P.A., Tampa, FL, for Quantum Chemical Corp.

Barney J. Chisolm, Jr., State of Fla., Dept. of Environmental Regulations, Tallahassee, FL, for amicus curiae State of Fla. Dept. of Environmental Regulation.

Richard J. Kissel, Pro Hac Vice, Deborah H. Bornstein, Pro Hac Vice, Gardner, Carton & Douglas, Chicago, IL, William H. Clark, Jr., Clark, Partington, Hart, Larry, Bond, Stackhouse & Stone, Pensacola, FL, for Archer Daniels Midland Co.

Kendrick Tucker, Huey, Guilday, Kuersteiner & Tucker, Donald L. Tucker, Donald L. Tucker, P.A., Law Offices, Tallahassee, FL, for Armstrong World Industries, Inc.

Denis V. Brenan, Pro Hac Vice, Michael R. Dillon, Pro Hac Vice, Deirdre M. Mullen, Sarah E. Davies, Pro Hac Vice, Morgan, Lewis & Bockius, Philadelphia, PA, Stephen Leermakers, Pro Hac Vice, Ashland Chemical Company, Div. of Ashland Oil, Inc., Columbus, OH, James A. Dixon, Jr., Collins, Shipman & Lucas, Tallahassee, FL, for Ashland Oil Co.

## ORDER

VINSON, District Judge.

Pending is the motion of defendant Quantum Chemical Corp. for summary judgment. (doc. 317). Also pending is plaintiff Reichhold Chemicals Inc.'s cross-motion for partial summary judgment on liability on Counts I, II, and III of the complaint. (doc. 327).

### I. BACKGROUND

Except as noted, the following facts are undisputed in the record. This lawsuit involves environmental contamination at an industrial site in Pensacola, Florida. The site is currently owned by plaintiff Reichhold Chemicals, Inc. ("Reichhold") and third-party defendant Arizona Chemical Co. ("Arizona").[1] For more than 70 years, various parts of this site have been utilized by many former owners for manufacturing purposes. Over the years these manufacturers disposed of a variety of hazardous substances at the site, resulting in a myriad of environmental problems.

The industrial operations at the site began in 1916. At different times, the property has been variously divided into several distinct parcels. There were numerous changes of ownership of the various parcels over the years, and it appears that all of the former owners have undergone mergers and name

---

1. Reichhold sold a portion of the site to Arizona on September 19, 1989. Immediately prior to that time, Reichhold owned the entire site.

changes. I set out only that part of this complex history necessary to the resolution of these motions.

In 1916, Newport Turpentine and Rosin Co. ("Newport") began an operation on part of the site to extract rosin, pine oil, turpentine, and other products from the stumps of pine trees. In 1939, U.S. Industrial Chemicals, Inc. ("U.S.I.") built a manufacturing facility on part of the site adjacent to the Newport facility. U.S.I. purchased rosin from Newport and used it as the basic material in its own resin production operation. U.S.I. operated the facility from 1939 until 1951. On July 31, 1951, U.S.I. merged into National Distillers Product Corp. ("National Distillers"), and National Distillers became the owner and operator of the former U.S.I. plant at the site. In 1954, National Distillers sold its interests in the site to defendant Archer–Daniels–Midland Co. On May 1, 1957, National Distributors was renamed National Distillers and Chemical Corp., and on January 4, 1988, became Quantum Chemical Corp. (collectively "Quantum").

On June 5, 1984, plaintiff Reichhold entered into a Consent Order with the Florida Department of Environmental Regulation ("FDER"), which obligated it to undertake various measures to investigate and remediate the contamination of groundwater on and under, and storm water runoff from, a portion of the site. Reichhold has since taken a number of costly steps to meet its obligation under the consent order. On July 29, 1985, defendant Textron, Inc. ("Textron") entered a similar consent order with FDER, agreeing to remediate pollution on another part of the site where Textron's Spencer Kellogg division had conducted a hard resin manufacturing operation and had operated what was called the "Spencer–Kellogg Basin" ("SKB"), a wastewater disposal site.[2] The consent order required Textron to drain and dispose of wastewater in the SKB, test the remaining sludge, and remove and dispose of any contaminated sludge. In addition, Textron was required to develop and implement a groundwater corrective action. However, the order also provided that if Textron could demon-

strate that Reichhold's groundwater corrective action plan addressed the groundwater contamination problems caused by Textron's activities, Textron would not have to treat groundwater, but only close the SKB. In 1987, as a result of demonstrating to FDER that Reichhold's corrective actions were addressing the groundwater contamination at the site, Textron was relieved of further obligations under the order.

On October 16, 1992, Reichhold brought this action against eight separate defendants to recover its current and anticipated response costs. All of the defendants (except Burlington Northern Railroad Co.) are former owners of at least some of the site. Count I of the complaint seeks to recover Reichhold's response costs in remediating the site, pursuant to Section 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") [42 U.S.C. § 9607(a) ]. Count II seeks contribution from the defendants for Reichhold's response costs, pursuant to Section 113(f) of CERCLA [42 U.S.C. § 9613(f) ]. Count III seeks a declaratory judgment that the defendants are liable for Reichhold's future response costs under Section 113(g)(2) of CERCLA [42 U.S.C. § 9613(g)(2) ]. Counts IV through XV purport to state various Florida statutory and common law causes of action. Of these fourteen counts, the ones applicable to Quantum are Count IV, which alleges a violation of the Florida Pollutant Spill Prevention and Control Act [§ 376.30, Fla.Stat.]; Count VI, which seeks contribution under the Florida Uniform Contribution Among Joint Tortfeasors Act [§ 768.31, Fla.Stat.]; and Counts VII through XII, which allege common law claims for indemnification, strict liability, nuisance, negligence, trespass, and restitution, respectively. Quantum has now moved for summary judgment.

## II. ANALYSIS

### A. Summary Judgment Standard.

A motion for summary judgment should be granted when "the pleadings, depositions, an-

---

2. Reichhold had purchased the Spencer–Kellogg division, including the operations and property in Pensacola, from Textron on September 9, 1983.

swers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. As the Supreme Court of the United States has instructed, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265, 273 (1986); *Everett v. Napper,* 833 F.2d 1507, 1510 (11th Cir.1987).

However, summary judgment is improper "[i]f a reasonable fact finder could draw more than one inference from the facts, and that inference creates a genuine issue of material fact." *Cornelius v. Highland Lake,* 880 F.2d 348, 351 (11th Cir.1989), *cert. denied,* 494 U.S. 1066, 110 S.Ct. 1784, 108 L.Ed.2d 785 (1990). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211 (1986). It is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. *Id. See also Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538, 552 (1986).

On summary judgment motion, the record and all inferences that can be drawn from it must be viewed in the light most favorable to the non-moving party. *See Souran v. Travelers Ins. Co.,* 982 F.2d 1497, 1502 (11th Cir.1993).

**B.** *Quantum's Motion for Summary Judgment.*

Quantum's motion for summary judgment makes three distinct arguments. First, Quantum asserts that it is entitled to summary judgment on Counts I and III of the complaint because a "liable" party may not bring a CERCLA contribution claim except as provided in Section 113(f). Second, Quantum contends that it is entitled to summary judgment on Count II of the complaint because the statute of limitations for contribution claims under Section 113(f) claims has run. Finally, Quantum contends that the statute of limitations has expired on all of the state law claims.[3] I will discuss each separately.

**1. Counts I and III: Contribution Claim by a Liable Party.** Congress enacted CERCLA in 1980 "[t]o provide for liability, compensation, cleanup, and emergency response for hazardous substances released into the environment and the cleanup of inactive hazardous waste disposal sites," Pub.L. No. 96–510, Stat. 2767 (1980) (purpose clause). Section 107(a), the liability section of CERCLA, defined four classes of potentially responsible parties ("PRPs"), and rendered them liable for "all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe" [42 U.S.C. § 9607(a)(4)(A) ], as well as "any other necessary costs of response incurred by any other person." 42 U.S.C. § 9607(a)(4)(B). Although Section 107(a) did not expressly create a private cause of action, federal district courts were "virtually unanimous" in holding that Section 107(a)(4)(B) impliedly created a private cause of action for response costs. *Key Tronic Corp. v. United States,* 511 U.S. ——, ——, n. 7, 114 S.Ct. 1960, 1965, n. 7, 128 L.Ed.2d 797, 805, n. 7 (1994) (citing *Walls v. Waste Resource Corp.,* 761 F.2d 311 (6th Cir.1985)). In doing so, these courts were allowing many of the private parties to bring contribution claims, despite the absence of any mention of a statutory right to contribution in the statute. Many courts relied upon the "incurred by any other person" language of Section 107 to reach that result, as the plaintiff urges me to do here.

---

**3.** The motion for summary judgment also included a fourth ground for granting the motion: that none of Quantum's predecessors-in-interest had disposed of hazardous substances at the site. This part of the summary judgment motion was denied in my earlier order of April 5, 1995 (doc. 393), and need not be discussed here.

■ Section 107 imposes joint and several liability on PRPs regardless of fault. *See, e.g., United States v. Fleet Factors Corp.,* 901 F.2d 1550, 1554 (11th Cir.1990), *cert. denied,* 498 U.S. 1046, 111 S.Ct. 752, 112 L.Ed.2d 772 (1991); *In re Bell Petroleum Services, Inc.,* 3 F.3d 889, 897 (5th Cir.1993); *New York v. Shore Realty Corp.,* 759 F.2d 1032, 1044 (2nd Cir.1985). The Tenth Circuit explained the rationale this way:

> Therefore, CERCLA, as originally enacted, left a PRP faced with the prospect of being singled out as the defendant in a cost recovery action without any apparent means of fairly apportioning CERCLA costs awarded against it to other PRPs. Courts responded to this inequity by recognizing a federal right to contribution where PRPs have been subject to joint and several liability and have incurred response costs in excess of their pro rata share.

*United States v. Colorado & Eastern Railroad Co.,* 50 F.3d 1530, 1535 (10th Cir.1995). Nevertheless, the existence of a CERCLA implied right of contribution via Section 107 was clouded by the repeated refusal of the Supreme Court of the United States to find such an implied right of contribution in other statutes. *See United Technologies Corp. v. Browning–Ferris Industries, Inc.,* 33 F.3d 96, 100 (1st Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1176, 130 L.Ed.2d 1128 (1995). Since there is no recognized common law right to contribution, many legal scholars were of the opinion that only an explicit statute could confer the necessary authorization for a contribution action, as discussed *infra.* In the absence of such a statutory provision, they felt that PRPs simply had no legal basis for contribution.

Not surprisingly, therefore, when CERCLA was amended by the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), one of the important amendments created a new Section 113(f) which expressly authorized a cause of action for contribution. 42 U.S.C. § 9613(f). *See Key Tronic Corp. v. United States, supra,* —— U.S. at ——, 114 S.Ct. at 1966, 128 L.Ed.2d at 805. Section 113(f) was apparently intended to

clarif[y] and confirm[ ] the right of a person held jointly and severally liable under CERCLA to seek contribution from other potentially liable parties, when the person believes that it has assumed a share of the cleanup or cost that may be greater than its equitable share under the circumstances.

S.Rep. No. 11, 99th Cong., 1st Sess. 44 (1985). In short, as amended by SARA, CERCLA provides two distinct types of legal actions by which parties can recoup some or all of their costs associated with hazardous waste cleanup: cost recovery actions under Section 107(a) and Section 113(g)(2), and contribution actions under Section 113(f). *United States v. Colorado & Eastern Railroad Co., supra,* 50 F.3d at 1534–35. Resolution of Quantum's motion for summary judgment on Counts I and III requires me to clarify the relationship between cost recovery actions and contribution actions, and who can recover under each provision, because different statutes of limitations apply.

In Count I of the complaint, Reichhold seeks to recover its ratable share of past response costs from each of the defendants, pursuant to Section 107(a). Count II seeks contribution from these defendants, pursuant to Section 113(f). Count III seeks a determination that Reichhold is entitled to recover its future response costs, pursuant to Section 113(g)(2). All three counts, while based on different sections of CERCLA, seek essentially the same amount of recovery. Quantum argues that because Reichhold is itself a liable party, that is, a joint tortfeasor, it is precluded from bringing a Section 107(a) [or Section 113(g)(2) ] claim, and is limited to a Section 113(f) contribution claim.

Quantum cites several appellate opinions holding that a liable PRP is barred as a matter of law from bringing a Section 107(a) claim against another PRP: *United Technologies Corp. v. Browning–Ferris Industries, Inc.,* 33 F.3d 96, 100 (1st Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1176, 130 L.Ed.2d 1128 (1995); *Akzo Coatings, Inc. v. Aigner Corp.,* 30 F.3d 761, 764 (7th Cir.1994); *Amoco Oil Co. v. Borden, Inc.,* 889 F.2d 664,

672 (5th Cir.1989).[4] On the other hand, Reichhold relies on a series of district court opinions which have held that a PRP may seek contribution from other PRPs under either Section 107(a) or Section 113(f): *Transportation Leasing Co. v. State of California*, 861 F.Supp. 931, 938 (C.D.Cal.1993); *Companies for Fair Allocation v. Axil Corp.*, 853 F.Supp. 575, 579 (D.Conn.1994); *United States v. SCA Services of Indiana, Inc.*, 849 F.Supp. 1264, 1280 (N.D.Ind.1994); *City of North Miami, Fla. v. Berger*, 828 F.Supp. 401, 407 (E.D.Va.1993); *Kelley v. Thomas Solvent Co.*, 790 F.Supp. 710, 717 (W.D.Mich. 1990); *United States v. Kramer*, 757 F.Supp. 397, 416 (D.N.J.1991); *Allied Corp. v. Acme Solvents Reclaiming, Inc.*, 691 F.Supp. 1100, 1105 (N.D.Ill.1988); *Chemical Waste Mgt., Inc. v. Armstrong World Industries, Inc.*, 669 F.Supp. 1285, 1291 (E.D.Pa.1987).[5]

The proper resolution of this issue is determined by the nature of contribution. Unlike indemnification, at common law there was no right of contribution among joint tortfeasors. *Northwest Airlines, Inc. v. Transport Workers Union of America*, 451 U.S. 77, 86, 101 S.Ct. 1571, 1578, 67 L.Ed.2d 750, 760 (1981); *Union Stock Yards Co. v. Chicago B & Q. Railroad Co.*, 196 U.S. 217, 25 S.Ct. 226, 49 L.Ed. 453 (1905); *Merryweather v. Nixan*, 101 Eng.Rep. 1337 (KB 1799). Most American jurisdictions have now abrogated the common law no-contribution rule, usually by statute, but in a few states by judicial decision. *Northwest Airlines, Inc. v. Transport Workers Union of America, Inc., supra*, 451 U.S. at 86–87, 101 S.Ct. at 1578, 67 L.Ed.2d at 760. However, while state courts may have the authority under the particular laws of that state to judicially create a general right of contribution, federal courts have not generally recog-

nized such authority, except in admiralty. *Id.* at 95–96, 101 S.Ct. at 1582, 67 L.Ed.2d at 766.

■ A federal right of contribution may arise in one of two ways. *Id.* at 90, 101 S.Ct. at 1580, 67 L.Ed.2d at 762. Normally, it is created, either explicitly or implicitly, by statute. *Id.* But, "[s]econd, a cause of action for contribution may have become a part of the federal common law through the exercise of judicial power to fashion appropriate remedies for unlawful conduct." *Id.* As to any judicially created right, however, "the federal lawmaking power is vested in the legislative, not the judicial, branch of government; therefore, federal common law is 'subject to the paramount authority of Congress.'" *Id.* at 95, 101 S.Ct. at 1582–83, 67 L.Ed.2d at 765–66 (quoting *New Jersey v. New York*, 283 U.S. 336, 348, 51 S.Ct. 478, 481, 75 L.Ed. 1104, 1108 (1931)).

■ Thus, once Congress addresses a subject via the enactment of a statute, even if it was previously governed by federal common law, the role of the federal courts is to interpret and apply the statutory law. *Id.; Illinois v. Milwaukee*, 406 U.S. 91, 107, 92 S.Ct. 1385, 1395, 31 L.Ed.2d 712, 725 (1972); *Arizona v. California*, 373 U.S. 546, 565, 83 S.Ct. 1468, 1480, 10 L.Ed.2d 542, 558 (1963). I accept the contention that there perhaps was a right of contribution in CERCLA actions, either implied in the language of Section 107(a) or judicially derived as a court-fashioned remedy, prior to the enactment of Section 113(f). But, Congress plainly modified that right of contribution when it adopted Section 113. Whatever may have been the status of contribution claims prior to the adoption of Section 113 was changed once Congress addressed the subject of contribution under CERCLA. Now, contribution claims are explicitly controlled by the statute. It necessarily follows that the exclu-

---

**4.** Quantum also cited *United States v. Colorado & Eastern Railroad Co.*, 1994 WL 647329 (10th Cir.1994). After the parties filed their briefs and reply briefs, the panel granted rehearing and vacated its earlier opinion. Within the past month, the court issued its opinion on rehearing, which I have cited in this order. *United States v. Colorado & Eastern Railroad Co.*, 50 F.3d 1530 (10th Cir.1995). The opinion on rehearing adopts the First Circuit's reasoning in *United*

*Technologies Corp. v. Browning Ferris Industries, Inc.*, 33 F.3d 96, 100 (1st Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1176, 130 L.Ed.2d 1128 (1995). *See also Kaufman and Broad-South Bay v. Unisys Corp.*, 868 F.Supp. 1212, 1215 (N.D.Cal.1994) (adopting *United Technologies Corp. v. Browning Ferris Industries, Inc.*)

**5.** Apparently, the Eleventh Circuit has not had an occasion to consider the issue.

sive remedy for a liable PRP seeking contribution from other PRPs is a Section 113(f) contribution claim.[6]

Reichhold has acknowledged that it is liable for causing some of the environmental contamination at the site. In Count I, Reichhold seeks to recover from the other PRPs their pro rata shares of its response costs. "[C]laims between PRPs to apportion costs between themselves are contribution claims pursuant to 113 regardless of how they are pled." *United States v. Colorado and Eastern Railroad Co.,* *supra,* 50 F.3d at 1530. "When one liable party sues another to recover its equitable share of the response costs, the action is one for contribution." *Amoco Oil Co. v. Borden, Inc.,* 889 F.2d 664, 672 (5th Cir.1989). Undoubtedly, Count I seeks contribution, and must be brought pursuant to Section 113, not Section 107(a). Accordingly, the Quantum's motion for summary judgment on Count I of the complaint is GRANTED.

The CERCLA statute of limitations [Section 9313(g)(2) ] for cost recovery actions authorizes a court to issue a declaratory judgment on liability that will be binding on any subsequent Section 9607 actions to recover future response costs or damages. By its explicit language, this limitations statute applies only to cost recovery actions under Section 107. As noted above, Reichhold is a liable party and cannot bring a Section 107 cost recovery action. Therefore, Quantum's motion to dismiss Count III of the complaint is GRANTED.

**2. Count II: Statute of Limitations on the Section 113 Claim.** Next, Quantum asserts that the statute of limitations has expired on the plaintiff's Section 113 claim for contribution set out in Count II of the amended complaint. The CERCLA statute of limitations applicable to contribution claims states:

---

**6.** Indemnification claims are still within Section 107, and there could be circumstances that may possibly generate claims that may be characterized as both indemnification and contribution. *See Kaufman and Broad–South Bay v. Unisys Corp.,* 868 F.Supp. 1212, 1215 (N.D.Cal.1994). Such is not the case here, however.

**(g) Period in which action may be brought**

\*    \*    \*    \*    \*    \*

**(3) Contribution**

No action for contribution for any response costs or damages may be commenced more than 3 years after

> **(A)** the date of judgment in any action under this chapter for recovery of such costs or damages, or

> **(B)** the date of an administrative order under section 9622(g) of this title (relating to de minimis settlements) or 9622(h) of this title (relating to cost recovery settlements) or entry of a judicially approved settlement with respect to such costs or damages.

42 U.S.C. § 9613(g)(3) [Section 113(g)(3) ].

■ Quantum advances two arguments in support of its contention that summary judgment should be granted on Count II. Initially, Quantum asserts that the consent order which Reichhold entered into with the FDER should be construed as triggering the running of the limitations period, pursuant to subsection 113(g)(3)(B).[7] First, it is not clear from the record which consent order involved the portion of the site on which Quantum's predecessor operated. *See* doc. 168. However, assuming that the 1984 consent order is applicable to Quantum's portion of the site, it does not trigger the three year statute of limitations as a matter of law. Quantum concedes that the 1984 consent order was not judicially approved, and that it does not fall within the other two categories of administrative orders specified in subsection 113(g)(3)(B). However, Quantum contends that the court should construe the 1984 consent decree entered between Reichhold and the FDER as a judicially approved settlement, mandated by the "plain language" of Section 113(g)(3). (Doc. 318, p. 317).

---

**7.** It is undisputed in this case that there has been no judgment in an action to recover costs, and subsection (A) is not applicable. Likewise, the other two provisions of subsection (B): de minimis settlements pursuant to 42 U.S.C. 9622(g) and the compromise and settlement of claims by the United States of America pursuant to 42 U.S.C. 9622(h) are clearly not applicable.

Quantum suggests two reasons why the 1984 consent decree should be deemed the equivalent of judicially approved: (1) it is judicially enforceable, and (2) although it did not do so, the FDER could theoretically have sought judicial approval. While both contentions may be true, they do not alter the interpretation. "It is axiomatic that the interpretation of a statute must begin, and usually ends, with the text of the statute." *Boca Ciega Hotel, Inc. v. Bouchard Transportation Co.*, 51 F.3d 235, 237 (11th Cir. 1995). In interpreting a statute, undefined words are to be given their ordinary meaning. *Asgrow Seed Co. v. Winterboer*, 513 U.S. ——, ——, 115 S.Ct. 788, 793, 130 L.Ed.2d 682, 691 (1995). The statute unambiguously requires a judicially approved settlement to trigger the statute of limitations, and it is undisputed that the 1984 consent decree was not judicially approved. In short, Quantum's suggested interpretation is contrary to the plain language of the statute, and that "is the end of the matter." *Brown v. Gardner*, 513 U.S. ——, ——, 115 S.Ct. 552, 556, 130 L.Ed.2d 462, 468 (1994).

Quantum also argues that, if the 1984 consent order is not within the scope of Section 113(g)(3), the court should "borrow" a statute of limitations. Quantum asserts that the borrowed limitations period should start to run on the date of the consent order, or at the latest, at some time in December of 1988 when Reichhold began remediation on the "Alkyd Plant," which was composed of the "former Quantum property" and the "former Spencer–Kellogg Basin."

There is no need to discuss what statute of limitations should be borrowed.[8] Quantum's proffered reason for "borrowing" the limitations period of some other cause of action is that statutes of limitations "are not disfavored." I agree, but it is irrelevant. This is not a situation where no limitations period specifically applies. When it enacted and amended CERCLA, Congress specifically included a statute of limitations. I am required to apply the limitations period mandated by Congress. It is not necessary, or even proper, to borrow another limitations period. *See Northwest Airlines, Inc. v. Transport Workers Union of America*, 451 U.S. 77, 95, 101 S.Ct. 1571, 1582–83, 67 L.Ed.2d 750, 765–66 (1981); *Illinois v. Milwaukee*, 406 U.S. 91, 107, 92 S.Ct. 1385, 1395, 31 L.Ed.2d 712, 725 (1972); *Arizona v. California*, 373 U.S. 546, 565, 83 S.Ct. 1468, 1480, 10 L.Ed.2d 542, 558 (1963). The 1984 Consent Order does not meet the statutory criteria of Section 113(g)(3), and the claim is not time barred. Quantum's motion for summary judgment on Count II of the complaint is DENIED.

**3. State Law Claims.** Finally, Quantum contends that all of the Florida state law claims are time barred. The parties appear to agree that all of the state law claims, except Count VI, are subject to a four-year statute of limitations, and that Count VI is subject to a one-year statute of limitations. *See* doc. 137, n. 1.

Quantum cites my order of September 1, 1993, as setting forth the discovery rule applicable to determining the limitations periods in environmental tort actions. Reichhold points out that Quantum failed to cite the 11th Circuit's subsequent decision in *Tucker v. Southern Wood Piedmont Co.*, 28 F.3d 1089, *reh'g. denied*, 38 F.3d 575 (11th Cir. 1994), as the controlling law.[9] It is of no consequence, for there is no difference between the two. CERCLA contains a federally mandated discovery rule for determining the beginning of the limitations period for environmental torts brought under state law. In 1986, Congress amended CERCLA to partially preempt state statutes of limitations. A federal "commencement date" for the running of the state limitations period was provided:

> In the case of any action brought under State law for personal injury, or property damages, which are caused or contributed to by exposure to any hazardous substance, or pollutant or contaminant, re-

---

8. In brief, Quantum argues the court should adopt either the general federal three year statute of limitations or the Florida one year limitations period for contribution actions.

9. *Tucker v. Southern Wood Piedmont Co.* appears to be the only 11th Circuit opinion dealing with this issue.

leased into the into the environment from a facility, if the applicable limitations period for such action (as specified in the State statute of limitations or under common law) provides a commencement date which is earlier than the federally required commencement date, such period shall commence at the federally required commencement date in lieu of the date specified in such State statute.

42 U.S.C. § 9658(a)(1). The federally required commencement date was defined as:

[T]he "federally required commencement date" means the date the plaintiff knew (or reasonably should have known) that the personal injury or property damages referred to in subsections (a)(1) of this section were caused or contributed to by the hazardous substance or pollutant or contaminant concerned.

42 U.S.C. § 9658(b)(4)(A).

Quantum argues that Reichhold learned of the contamination at the site no later than June 30, 1988, triggering the statute of limitations. This action was commenced on October 16, 1992, or more than four years later. Quantum asserts that all of the state law causes of action are thus barred by the statute of limitations.

■ Reichhold does not deny that it learned of the contamination at the former Quantum property no later June 30, 1988. However, Reichhold contends that until some time in 1992, it did not have any reason to suspect that the contamination resulted from the activities of any former owners. Until that time, Reichhold says it believed that the contamination at the Quantum property was the result of the migration of pollutants from the former Tenneco property, and that the pollution was the result of Reichhold's own activities. Reichhold contends that the CERCLA commencement date is the date it learned of the identity of the other tortfeasor, not the date it learned of the injury. In support of this contention, Reichhold relies on a sentence in the *Tucker v. Southern Wood Piedmont Co.* opinion: "As long as Plaintiffs sued within four years of the time they discovered or should have discovered

the wrongs of which they complain, their recovery will not be limited to the four years immediately proceeding the filing of the lawsuit." 28 F.3d at 1092. Reichhold contends that because it did not discover that earlier owners had contributed to the contamination of the site until 1992, it did not "discover the wrong" until then.

■ While the word "wrong" in the *Tucker v. Southern Wood Piedmont* opinion is broadly used, the language of the statute is not susceptible to such broad construction. The statute simply states that the federal commencement date is when the plaintiff knows that the injury or damages were caused or contributed to "by the hazardous substance or pollutant or contaminant concerned." 42 U.S.C. § 9658(b)(4)(A); *See also Tri–County Business Campus Joint Venture v. Clow Corp.*, 792 F.Supp. 984, 985 (E.D.Pa. 1992). Moreover, it is not necessary that the plaintiff know the identity of every specific pollutant or contaminant, but only the fact of the contamination. *See, e.g., Presque Isle Harbor Development Co. v. Dow Chemical Co.*, 875 F.Supp. 1312, 1319 (W.D.Mich.1995); *Torrance Redevelopment Agency v. Solvent Coating Co.*, 763 F.Supp. 1060, 1067 (C.D.Cal.1991).

As noted above, the longest limitations period for any of the state law claims against Quantum is four years. The complaint was filed on October 16, 1992. It is undisputed in the record that Reichhold knew of the hazardous substance or pollutant or contaminant concerned no later than June 30, 1988, thus triggering the limitations period under the federal rule. Therefore, all the applicable Florida statutes of limitations had expired when the complaint was filed. Quantum's motion for summary judgment on Counts IV, VI, VII, VIII, IX, X, XI, and XII is GRANTED.

### C. *Reichhold's Cross–Motion for Partial Summary Judgment.*

Reichhold has filed a cross-motion for partial summary judgment on the issue of liability on the CERCLA claim.[10] In order to

---

10. The cross-motion was addressed to Counts I, II, and III. Since Counts I and III have been

recover contribution from Quantum, Reichhold must prove that (1) the property on which hazardous substances were contained is a facility under CERCLA's definition of that term, (2) that the release or threatened release of any hazardous substance from the facility has occurred, (3) that such release or threatened release caused Reichhold to incur response costs that were necessary and consistent with the National Contingency Plan, and (4) that Quantum was within one of the four statutory classes of persons subject to liability. *Kerr–McGee Chemical Corp. v. Lefton Iron & Metal Co.,* 14 F.3d 321, 325 (7th Cir.1994); *United States v. Carolina Transformer Co.,* 978 F.2d 832, 836 (4th Cir. 1992); *3550 Stevens Creek Assoc. v. Barclays Bank,* 915 F.2d 1355, 1358 (9th Cir.1990), *cert. denied,* 500 U.S. 917, 111 S.Ct. 2014, 114 L.Ed.2d 101 (1991). If these four elements are established as undisputed, summary judgment on the issue of liability is appropriate. Quantum concedes that the site is a CERCLA facility, that the release of hazardous substances has occurred, and that Reichhold has incurred response costs. Thus, the only remaining question is whether Quantum is a statutorily liable party.

In pertinent part, CERCLA provides that "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of, . . . shall be liable." 42 U.S.C. § 9607(a)(2). So, the dispositive issue is whether Quantum's predecessors disposed of hazardous substances during the time they operated at the site. CERCLA incorporates the definition of "disposal" set forth in the Solid Waste Disposal Act:

> the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

42 U.S.C. § 6903(3) (incorporated at 42 U.S.C. § 9601(29)).

As noted above, Quantum's predecessors operated at the site from 1939 to 1954. Contained in the record are deposition extracts and affidavits from Carmen D. Strohl, who managed the plant from May 1944 to April 1977, and Erik Aberg, who was employed at the manufacturing plant from 1946 to 1981. Both men worked at the resin manufacturing facility during Quantum's ownership, and also for the subsequent owners. Understandably, given the length of time involved, both men are uncertain of dates, or even of the ownership, when certain events occurred.

After the motion for summary judgment and the parties' memoranda had been filed, Quantum produced U.S.I.'s journal vouchers for 1949 to 1951 operations at the site.[11] These documents demonstrate that U.S.I. purchased, and stored at the site, many of the chemicals responsible for the contamination at the site. The vouchers also include postings to miscellaneous expenses for solvents and "caustics" used in cleaning reactors. However, Strohl and Aberg testified that solvents were not used in cleaning reactors during the U.S.I. period. Similarly, the journals included a posting to miscellaneous expense as a write-off of chemicals carried in inventory, but missing from the thinning tank. Reichhold argues that this indicates that the chemicals either leaked from the tank or were spilled. The leakage or spillage of hazardous substances inside a plant constitutes "disposal" under CERCLA as a matter of law. *See, e.g., Amland Properties Corp. v. Aluminum Co. of America,* 711 F.Supp. 784, 791 (D.N.J.1989). However, Quantum relies upon the absence in the record of direct evidence of leakage or spillage, contending that such cannot be inferred from the undisputed disappearance of the chemicals.

Quantum manufactured a number of resins at the site known as "modified phenolics." Reichhold contends that the wastewater from manufacturing all of these resins included phenol. However, Strohl's amended affidavit states that phenol was a byproduct of the production of only one of these resins, a phenol modified hard resin known as Aro-

dismissed, *supra,* only the issue of Quantum's liability under Count II is at issue.

**11.** The journals for 1952 through 1954 have not been produced.

chem 365. The other phenolic resins were modified with other phenolic derivatives, usually bis-phenol and para-tertiary butyl phenol (also toxic substances). Strohl does not explicitly deny that the production of the resins which were modified with other phenolics would have left those substances in the wastewater, but states that Quantum's wastewater was only tested in the 1950s for phenol. Therefore, it is not possible to conclusively state that the other phenolics were present in the Quantum's wastewater.

It is undisputed that Arochem 365 was produced at the site, and that when this resin was produced, the wastewater would have contained phenol. It is also undisputed in the record that in 1953, U.S.I. constructed and used an unlined earthen pond to store wastewater.[12] U.S.I. operated this unlined pond through no later than November 1, 1953, until it sold the property on July 1, 1954. Therefore, if Quantum manufactured any Arochem 365 between November 1, 1953, and July 1, 1954, the phenol contaminated wastewater would have gone into the unlined pond, and Quantum is liable. However, Quantum maintains that this is rebutted by the affidavits of Carmen Strohl and Erik Aberg. Strohl and Aberg both state that there was a period of unspecified duration, between unknown dates, in which there was a "lull" and no phenol-formaldehyde resins were produced at the plant. Quantum postulates the possibility that this period could have been during the entire eight-month period Quantum operated the pond, and that it is conceivable that no phenol was disposed of at the site by Quantum.[13]

Further, Strohl originally testified in his 1993 deposition that alkyds were manufactured at the site during the U.S.I. period. However, in his 1995 amended affidavit, Strohl concludes that they probably were not, since they were not listed on the 1951–52 journals. Aberg also testified that alkyds

were not manufactured at the site during the U.S.I. period. Again, the missing 1951 journals preclude a definitive answer to this issue.

■ In short, there is a plethora of circumstantial evidence, but no direct evidence, that Quantum disposed of hazardous materials at the site. Quantum argues that the lack of records from the period, coupled with the testimony of Strohl and Aberg, create a genuine issue of material fact as to whether Quantum disposed of hazardous materials during the years (1939—1954) it operated at the site. The more implausible the claim or defense asserted by the opposing party, the more persuasive its evidence must be to avoid summary judgment. *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538, 552 (1986). Nevertheless, "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202, 216 (1986). I will assume that a reasonable factfinder could find from a preponderance of the evidence in the record that Quantum did not directly dispose of hazardous substances at the site. However, that is not the end of the inquiry.

■ To trigger liability, CERCLA requires only the presence at a facility of any of CERCLA's listed hazardous substances. *B.F. Goodrich v. Murtha*, 958 F.2d 1192, 1201 (2nd Cir.1992); 42 U.S.C. § 9601(14). For the purposes of liability, the statute does not now require any threshold quantity or concentration of hazardous substance. *Murtha, supra*, 958 F.2d at 1200, *New York v. Exxon Corp.*, 744 F.Supp. 474, 485–86 n. 16 (S.D.N.Y.1990).

■ Causation is a peripheral issue under CERCLA. *See, e.g., United States v. DiBiase Salem Realty Trust*, 1993 WL

12. Prior to the construction of the pond, wastewater was removed from the premises via a City of Pensacola sewer line which emptied into Bayou Chico. U.S.I. also constructed a second unlined "separator pond" during the same time frame.

13. Of course, whether Arochem 135 was manufactured from November 1, 1953, to July 1, 1954, could be conclusively established by the voucher journals for that period. However, as noted *supra*, Quantum has not produced the journals for that date. Presumably they are no longer extant, or Quantum has not yet been able to locate them in its archives.

729662, *4 (D.Mass.1993). The plaintiff is not required to link the defendant's conduct or the defendant's waste firmly to the release or threat of release. "The release or threat of release need only have emanated from a facility which [defendant] owned." *Dedham Water Co. v. Cumberland Farms Dairy, Inc.,* 889 F.2d 1146, 1153 (1st Cir.1989).

Strohl testified that during heavy rains, storm water runoff, which included "wood chips, chemical waste and debris," from the adjacent Newport facility (which underwent several name/ownership changes) ran onto the U.S.I. property, which was of lower elevation. Strohl knew these wood chips were contaminated with solvents because they would sometimes spontaneously burst in flames. Quantum has admitted that it knew that these wood chips were contaminated with toluene. Thus, it is undisputed in the record that during the U.S.I.–National Distillers period, toluene was on the site. Reichhold asserts that, regardless of whether Quantum directly deposited hazardous substances at the site, Quantum is liable under CERCLA for the toluene deposited at the site by the storm water.

■ While it may seem inequitable, the mere migration of contaminants from adjacent land constitutes disposal for the purposes of CERCLA, and passive downstream landowners are liable for the cleanup costs resulting from their neighbors' activities. *See Lincoln Properties, Ltd. v. Higgins,* 823 F.Supp. 1528, 1536 (E.D.Cal.1992); *Courtaulds Aerospace, Inc. v. Huffman,* No. CV–F–91–518, 1994 WL 508168, *1, (E.D.Cal. June 9, 1994). Quantum's status as a passive landowner with regard to the storm water runoff is not a defense to CERCLA. *See, e.g., New York v. Shore Realty Corp.,* 759 F.2d 1032, 1045 (2nd Cir.1985).[14] Quantum has admitted that, while it owned the property, toluene was disposed of on the site when stormwater carried contaminated wood chips to the site. Unless Quantum can assert one of the statutory defenses, it is a liable party under CERCLA. 42 U.S.C. § 9607(a)(2).

■ An otherwise liable party may avoid CERCLA liability only by establishing one of the three affirmative defenses set forth in Title 42, United States Code, Section 9607(b) [CERCLA Section 107(b)]. *See United States v. Azrael,* 765 F.Supp. 1239, 1242 (D.Md.1991). Section 9607(b) provides:

> ·There shall be no liability under subsection (a) of this section for a person otherwise liable who can establish by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by—
>
> (1) an act of God;
>
> (2) an act of war;
>
> (3) an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant (except where the sole contractual arrangement arises from a published tariff and acceptance for carriage by a common carrier by rail), if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned, taking into considerations the characteristics of such hazardous substance, in light of all relevant facts and circumstances, and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions; or
>
> (4) any combination of the foregoing paragraphs.

42 U.S.C. § 9607(b).

■ Quantum contends that it is entitled to the Section 9607(b)(3) third party defense for any disposal resulting from contaminated storm water runoff from the Newport facility. These defenses are narrowly construed to effectuate the statute's broad remedial purposes. *Lincoln Properties, Ltd. v. Higgins,* 823 F.Supp. 1528, 1539 (E.D.Cal. 1992); *Kelley v. Thomas Solvent Co.,* 727 F.Supp. 1532, 1540 (W.D.Mich.1989). Sec-

---

**14.** This result is inevitable, for if a passive landowner could not be liable, the Section 9607(b)(3) third-party defense discussed hereinafter would be superfluous.

tion 9607(b) defenses are affirmative defenses which shift the burden of proof from the plaintiff to the defendant to show by a preponderance of the evidence that the release or threatened release of toxic substances was due solely to the act of a third party. *United States v. A & N Cleaners and Launderers, Inc.*, 854 F.Supp. 229, 239 (S.D.N.Y.1994); *O'Neil v. Picillo*, 682 F.Supp. 706, 728 (D.R.I. 1988), *aff'd.*, 883 F.2d 176 (1st Cir.1989), *cert. denied*, 493 U.S. 1071, 110 S.Ct. 1115, 107 L.Ed.2d 1022 (1990). On a motion for summary judgment, the defendant bears the burden of bringing forth evidence supporting this defense. *Chatham Steel Corp. v. Brown*, 858 F.Supp. 1130, 1154 (N.D.Fla.1994).

■■■■ To avail oneself of the third-party defense, the third party must not have been one "whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant." 42 U.S.C. § 9607(b). Quantum purchased rosin, the principal raw ingredient in resin, and cooling water from the Newport facility. Indeed, the plant was constructed at the site so that it would be adjacent to the source of raw materials. *See* Amended Strohl aff., also U.S. Items docs.[15] Clearly, Quantum had a contractual relationship with Newport. Reichhold asserts that Section 9607(b)(3) should be interpreted broadly to preclude any defendant which had a contractual relationship with a polluter from asserting the third-party defense, and that the contractual relationship between Quantum and Newport is enough to bar Quantum from asserting the defense as a matter of law. Quantum has not addressed the issue in its memorandum other than to question the admissibility of one of Reichhold's exhibits.

Some district court opinions support Reichhold's broad reading of Section 9607(b)(3). *See, e.g., O'Neil v. Picillo*, 682 F.Supp. 706, 728 (D.R.I.1988) (to establish a Section 9607(b)(3) defense, defendant must

show that " 'a *totally unrelated third party* is the *sole* cause of the release' ") (emphasis in original) (quoting *United States v. Stringfellow*, 661 F.Supp. 1053, 1061 (C.D.Cal. 1987)); *City of Philadelphia v. Stepan Chemical Co.*, 18 Envtl.L.Rep. 20133, 20134, 1987 WL 15214 (E.D.Pa.1987) (Section 9607(b)(3) defense is "limited ... to situations where the responsible party has *no* connection to the third party") (emphasis in original).

More recent opinions, however, have construed the statute differently. *See, e.g., Westwood Pharmaceuticals, Inc. v. National Fuel Gas Distribution Corp.*, 964 F.2d 85, 89 (2nd Cir.1992); *Chatham Steel Co. v. Brown*, 858 F.Supp. 1130, 1155 n. 18 (N.D.Fla.1994); *Lincoln Properties, Ltd. v. Higgins*, 823 F.Supp. 1528, 1543 (E.D.Cal.1992); *United States v. A & N Cleaners and Launderers, Inc.*, 788 F.Supp. 1317, 1335 (S.D.N.Y.1992); *Shapiro v. Alexanderson*, 743 F.Supp. 268, 271 (S.D.N.Y.1990). I agree with these courts that there must be a connection between the contractual relationship and the act or omission that resulted in the contamination. This construction is mandated by the plain language of the statute. To hold that any contractual relationship precludes asserting the defense would render the words "in connection with" mere surplusage. *Cf. United States v. A & N Cleaners and Launderers, Inc., supra,* 788 F.Supp. at 1335.

■■■ Undeniably, Quantum held a contractual relationship with Newport. The record is unclear as to how, if at all, this relationship affected the washing of wood chips and other debris from the Newport property. There is no evidence that the contractual relationship between Quantum and Newport was connected to or related to the flow of storm water onto the property. Under the language of the statute, this unrelated contractual relationship does not preclude Quantum from asserting the third-party defense.

15. Reichhold has filed in the record the April 1942, October–November 1944, and October–November 1945 issues of *U.S. Items. U.S. Items* was a "house organ which detailed the activities of various plants and people of U.S.I. Corp," which were made and kept in the ordinary course of business. Hricewich dep. Quantum asserts that these documents are inadmissible hearsay. They may be admissible under the business records exception to the hearsay rule. F.R.E. 803(6). In any event, there is no question as to the authenticity of the documents and they are all at least fifty years old, so as to be admissible under the ancient documents exception. F.R.E. 803(16).

To prevail on the Section 9607(b)(3) defense, Quantum must show that it "exercised due care with respect to the hazardous substance concerned," [the "Due Care Requirement"] and that it "took precautions against foreseeable acts or omissions of any such third party and the consequences that could conceivably result from such omissions" [the "Precautionary Requirement"]. 42 U.S.C. § 9607(b)(3). A careful review of the record reflects that genuine issues of material fact exist as to this defense. Therefore, the plaintiff's motion for partial summary judgment on the issue of liability as to Count II is DENIED.

### III. CONCLUSION

Quantum's motion for summary judgment on Counts I, III, IV, VI, VII, VIII, IX, X, XI, and XII of the complaint is GRANTED. Quantum's motion for summary judgment on Count II is DENIED. Reichhold's cross-motion for partial summary judgment on the issue of liability on Count II of the complaint is also DENIED. Reichhold's cross-motion for partial summary judgment on Counts I and III is DENIED, as moot. The case will proceed on Count II only. The clerk will enter judgment in accordance with this order.

DONE AND ORDERED.